No. 24-1881

## In the United States Court of Appeals
## for the Sixth Circuit

DONALD J. ROBERTS, II, AND GUN OWNERS OF AMERICA, INC.,
Plaintiffs-Appellants,

v.

U.S. DEPARTMENT OF JUSTICE, BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, AND STEVEN DETTELBACH,[1] in his official capacity as Director, Bureau of Alcohol, Tobacco, Firearms and Explosives,
Defendants-Appellees.

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN
The Honorable District Court Judge Thomas L. Luddington
Civil Action No. 1:20-cv-10639

## BRIEF FOR APPELLANTS

Robert J. Olson
WILLIAM J. OLSON, P.C.
370 Maple Avenue West, Ste. 4
Vienna, VA 22180
T: (703) 356-5070
rob@wjopc.com

Stephen D. Stamboulieh
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS 38654
T: (601) 852-3440
stephen@sdslaw.us

Kerry Lee Morgan
PENTIUK, COUVREUR & KOBILJAK, P.C.
2915 Biddle Avenue, Suite 200
Wyandotte, MI 48192
T: (734) 281-7100
kmorgan@pck-law.com

Dated: December 11, 2024

---

[1] Pursuant to Fed. R. App. P. 43(c)(2), ATF Director Steven Dettelbach is automatically substituted for Regina Lombardo.

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 24-1881            Case Name: Roberts, et al. v. U.S. Dept. of Justice

Name of counsel:  Stephen D. Stamboulieh

Pursuant to 6th Cir. R. 26.1, Gun Owners of America, Inc.
                               *Name of Party*
makes the following disclosure:

1.     Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the
       identity of the parent corporation or affiliate and the relationship between it and the named
       party:

> No.

2.     Is there a publicly owned corporation, not a party to the appeal, that has a financial interest
       in the outcome?  If yes, list the identity of such corporation and the nature of the financial
       interest:

> No.

## CERTIFICATE OF SERVICE

I certify that on _____ December 11, 2024 _____ the foregoing document was served on all
parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not,
by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Stephen D. Stamboulieh
Counsel for Appellants
_____

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs,
immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

STATEMENT CONCERNING ORAL ARGUMENT……………………………vi

JURISDICTIONAL STATEMENT…………………………………………...1

STATEMENT OF THE ISSUES…………………………………………...1

STATEMENT OF THE CASE……………………………………………..1

    Background………………………………………………………....………1

    Proceedings Below………………………………………………...……4

SUMMARY OF ARGUMENT………………………………………………...12

STANDARD OF REVIEW……………………………………………………14

ARGUMENT………………………………………………………………...14

I.      PLAINTIFFS HAVE STANDING………………………….………......14

    A. ATF's 2020 PSA Harmed Plaintiffs by Revoking an Acquired
       Benefit……………………………………………………………..16

    B. Case Law Supports Plaintiffs' Standing………………………………...21

    C. The District Court's Conclusion Invites Absurd Results………………..25

    D. This Court's Prior Opinion Establishes Plaintiffs' Standing……………28

    E. Under the District Court's Analysis, it is Entirely Unclear Who Would
       Have Standing to Challenge the PSA………………………………...30

    F. Plaintiffs' Harm Is Traceable to Defendants and Redressable by This
       Court…………………………………………………………………32

II.    THE 2020 PSA IS UNLAWFUL AND MUST BE VACATED……………34

    A. The 2020 PSA Was Promulgated Without Any Evidence that "the Law of
       the State" Had Changed………………………………………………...34

    1. Defendants Needed to Make an Additional Showing on Remand…..34

    2. Defendants Failed to Provide Further Justification for the 2020 PSA………………………………………………………………….35

    3. Michigan's Amicus Brief Cannot Justify the 2020 PSA…………….39

B. Section 922(t)(3) Does Not Require an Ends-of-the-Earth Pursuit of Any Disqualifying Record or Erroneously Issued Permit…………………...41

    1. As This Court Previously Determined, Michigan Need Not Ferret Out Every Possible Disqualifying Conviction……………………....…41

    2. ATF's "Corrective Measures" Have No Legal Basis……………..44

C. The 2020 PSA Is Arbitrary and Capricious…………………………...46

CONCLUSION……………………………………………………………………...51

ADDENDUM

# TABLE OF AUTHORITIES

**Holy Bible**

Matthew 7:3-5 KJV......................................................................................49

**Constitutional Provisions**

Article III…………………………………………………………………..passim

**Statutes**

18 U.S.C. § 922(t)(3) ...................................................................... passim
18 U.S.C. § 922(t)(3)(B) .............................................................. 23, 26
34 U.S.C. § 40901.............................................................................23
Brady Handgun Violence Prevention Act .................................. 1, 5, 7, 36
MCL § 28.426 ........................................................................ passim
Tenn. Code Ann. § 39-17-1316(e)(1).......................................................18

**Cases**

*ACLU v. Santillanes*, 506 F. Supp. 2d 598 (D.N.M. 2007).......................................19
*Am. Fid. Bank & Tr. Co. v. Heimann*, 683 F.2d 999 (6th Cir. 1982) ......................37
*Antonyuk v. James*, 2024 U.S. App. LEXIS 26958 (2d Cir. Oct. 24, 2024) ..... 27, 34
*Barry v. Lyon*, 834 F.3d 706 (6th Cir. 2016).........................................................28
*Beer & Wine Ass'n v. Att'y Gen.*, 142 Mich. App. 294 (1985) ...............................38
*Binno v. ABA*, 826 F.3d 338 (6th Cir. 2016)........................................................33
*Bldg. Serv. Emps. Int'l Union v. Gazzam*, 339 U.S. 532 (1950)............................36
*Celona v. Erickson*, 270 F. Supp. 3d 473 (D. Mass. 2017)....................................20
*Chamber of Com. of U.S. v. SEC*, 115 F.4th 740 (6th Cir. 2024)...........................39
*Chamber of Commerce of United States v. SEC*, 670 F. Supp. 3d 537 (M.D. Tenn. 2023)....................................................................................................50
*City of Missoula v. Fox*, 450 P.3d 898 (Mont. 2019) ............................................24
*Clinton v. City of New York*, 524 U.S. 417 (1998) .................................................19
*Courtney v. Smith*, 297 F.3d 455 (6th Cir. 2002) ................................................16
*Crossroads Grassroots Pol'y Strategies v. FEC*, 788 F.3d 312 (D.C. Cir. 2015)....19
*Elhert v. Settle*, 105 Va. Cir. 326 (Lynchburg 2020) ............................................24
*Erie R.R. v. Tompkins*, 304 U.S. 64 (1938) ..........................................................38
*Ferguson v. Gonyaw*, 64 Mich. App. 685 (1975)....................................................37
*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167 (2000) ............................................................................................................15
*Gazzola v. Hochul*, 88 F.4th 186 (2d Cir. 2023) ..................................................25
*Grow Mich., LLC v. LT Lender, LLC*, 50 F.4th 587 (6th Cir. 2022) ........................33
*Howe v. City of Akron*, 801 F.3d 718 (6th Cir. 2015)............................................29

*Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*, 542 F.3d 529 (6th Cir. 2008) ......14

*Kerchen v. Univ. of Mich.*, 100 F.4th 751 (6th Cir. 2024) ........................................30

*Kreis v. Sec'y of the Air Force*, 406 F.3d 684 (D.C. Cir. 2005) ..............................50

*Leander Indep. Sch. Dist. v. DOI*, 2022 U.S. Dist. LEXIS 240533 (W.D. Tex. Dec. 21, 2022)................................................................................................................20

*Lee v. DOJ*, 554 F. Supp. 3d 1228 (N.D. Ala. 2021) ..................................... passim

*Liberty Initiative Fund v. Thurston*, 2022 U.S. Dist. LEXIS 68615 (E.D. Ark. Apr. 13, 2022)................................................................................................................25

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ........................................................15

*McKay v. Federspiel*, 823 F.3d 862 (6th Cir. 2016)..................................................14

*Messina v. U.S. Citizenship & Immigr. Servs.*, 2006 U.S. Dist. LEXIS 10292 (E.D. Mich. Feb. 16, 2006) .........................................................................................41

*Michigan ex rel. Oakland Cnty. Prosecutor v. Dep't of Corr.*, 199 Mich. App. 681 (1993)................................................................................................................38

*Mitchell v. Atkins*, 483 F. Supp. 3d 985 (W.D. Wash. 2020)...................................25

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983).39

*N.Y. Life Ins. Co. v. Hamburger*, 174 Mich. 254 (1913)..........................................38

*N.Y. State Firearms Ass'n v. James*, 2024 U.S. Dist. LEXIS 80568 (W.D.N.Y. May 2, 2024).............................................................................................................25

*Poole v. Harvey*, 571 F. Supp. 2d 120 (D.C. Cir. 2008)...........................................40

*Printz v. United States*, 521 U.S. 898 (1997) ..........................................................46

*Rhode v. Becerra*, 445 F. Supp. 3d 902 (S.D. Cal. 2020) ......................................24

*Rhode v. Bonta*, 2022 U.S. App. LEXIS 32554 (9th Cir. Nov. 17, 2022)................24

*Robinson v. Sessions*, 721 F. App'x 20 (2d Cir. 2018)........................ 22, 23, 24, 28

*Rocky Mountain Gun Owners v. Hickenlooper*, 371 P.3d 768 (Colo. App. 2016) ..24

*Sgaggio v. Polis*, 2023 U.S. Dist. LEXIS 116080 (D. Colo. July 6, 2023) .............25

*Sheldon v. Vilsack*, 538 F. App'x 644 (6th Cir. 2013) ..............................................30

*Sierra Club v. Slater*, 120 F.3d 623 (6th Cir. 1997) .................................................40

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ................................... 18, 21, 22

*State Farm Fire & Cas. Co. v. Liberty Ins. Underwriters, Inc.*, 613 F. Supp. 2d 945 (W.D. Mich. 2009).........................................................................................38

*T.H.E. Ins. Co. v. Naghtin*, 916 F.2d 1082 (6th Cir. 1990).....................................15

*Taylor v. Principi*, 92 F. App'x 276 (6th Cir. 2004) ...................................................51

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) .................... 17, 19, 21, 22

*United States v. Miller*, 734 F.3d 530 (6th Cir. 2013) ..............................................14

*United States v. White*, 846 F.3d 170 (6th Cir. 2017)...............................................14

*Willis v. Winters*, 253 P.3d 1058 (Or. 2011) ............................................................45

*Wyoming ex rel. Sullivan v. Lujan*, 969 F.2d 877 (10th Cir. 1992) ..........................32

**Regulations**

27 C.F.R. § 478.102(c) ...................................................................17
28 C.F.R. § 25.5 .............................................................................44
28 C.F.R. § 25.9(b)(1)(ii) ...............................................................48
63 Fed. Reg. 8381 (Feb. 19, 1998) ................................................41

**Other Authorities**

Congressional Research Service Report 45970 ...............................18
E. Miller, "Documents Show FBI and ATF Warrantless Surveillance Through Gun
   Background Checks, Jan. 17, 2023, Epoch Times ............................18
FBI, NICS 2022 Operations Report............................................. 18, 49
FBI: Firearm-Related Challenge (Appeal) and Voluntary Appeal File (VAF) ........44
FBI: NICS Firearm Background Checks: Day/Month/Year ....................................44
Mich. H. Fiscal Agency B. Analysis, H.B. 4977 (Sept. 13, 2005) .........................37
Michigan State Police CPL Applications by County ...............................................47
Open Letter to Michigan Federal Firearms Licensees..........................................3, 4
Permanent Brady Permit Chart ...................................................................2, 26
Public Safety Advisory to All Michigan Federal Firearms Licensees ("PSA")
.................................................................................................... passim
Roll Call Freedom of Information Act Request (November, 2019) .......................48

**STATEMENT CONCERNING ORAL ARGUMENT**

Pursuant to 6th Circuit Rule 34(a), Plaintiffs-Appellants respectfully request oral argument in this case because this appeal involves a challenge to an agency's unlawful revocation of a statutory method to purchase a firearm, namely, that if a person has been issued a permit to carry a firearm that meets the statutory requirements of 18 U.S.C. § 922(t)(3), then that person is exempt from another background check at the time of purchase. Oral argument would serve to focus the Court's attention on key considerations of standing and the proper statutory interpretation.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 5 U.S.C. § 702 and 28 U.S.C. § 1331. Complaint, R.1, Page ID#3. The district court dismissed Appellants' Complaint for lack of Article III standing. Order, R.70, Page ID#1417. Appellants filed a timely Notice of Appeal on October 8, 2024, R.72, Page ID#1420. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1) Whether the district court erred by dismissing the case for lack of standing?

2) Whether MCL § 28.426 qualifies under 18 U.S.C. § 922(t)(3) to exempt holders of Michigan Concealed Pistol Licenses from the National Instant Criminal Background Check System when purchasing firearms from federally licensed firearms dealers?

## STATEMENT OF THE CASE

### Background

As part of the Brady Handgun Violence Prevention Act ("Brady Act") Congress required that, before a federally licensed firearms dealer ("FFL") may transfer a firearm to a non-licensee, he first must run a background check through the Federal Bureau of Investigation's ("FBI") National Instant Criminal Background Check System ("NICS" or "NICS check") and, subsequently, may not transfer a firearm to a customer reported to be among certain categories of persons federally

prohibited from obtaining or possessing firearms ("prohibited persons"). *See* 18 U.S.C. § 922. However, Congress provided certain exceptions to this requirement, including the one in subsection 922(t)(3), providing that a NICS check is not required if the transferee possesses a qualifying state firearms permit (a "Brady Alternate"):

> (3) Paragraph (1) shall not apply to a firearm transfer between a licensee and another person if—
> (A)(i) such other person has presented to the licensee a permit that —
> (I) allows such other person to possess or acquire a firearm; and
> (II) was issued not more than 5 years earlier by the State in which the transfer is to take place; and
> (ii) the law of the State provides that such a permit is to be issued only after an authorized government official has verified that the information available to such official does not indicate that possession of a firearm by such other person would be in violation of law.... [18 U.S.C. § 922(t)(3).]

Although no federal law grants ATF the authority to determine which States' permits qualify as Brady Alternates, ATF publishes a list of those state permits that it believes qualify. *See* Permanent Brady Permit Chart, https://www.atf.gov/rules-and-regulations/permanent-brady-permit-chart.

Between 1998 (when the NICS system became operational) and 2005, ATF took the position that the then-existing Michigan statute providing for a "concealed pistol license" ("CPL") did not qualify as a Brady Alternate. *See* September 27, 2024 Order ("Order"), R.70, Page ID##1403-1404. But in 2005, Michigan changed its law specifically "'[t]o align the state statute … with [] federal law.'" December

17, 2020 Order ("2020 Order"), R.25, Page ID#552. Thus, MCL § 28.426(2) now requires, in pertinent part, that "[a] county clerk shall not issue a license … unless … [law enforcement] … has determined through the [NICS] system that the applicant is not prohibited under federal law from possessing or transporting a firearm."

Shortly after that amendment, then-Attorney General of Michigan Mike Cox sought confirmation from ATF that the revised Michigan CPL statute would qualify as a Brady Alternate. Order, R.70, Page ID#1404. ATF agreed, issuing an "Open Letter to Michigan Federal Firearms Licensees" stating that Michigan CPLs would now be considered Brady Alternates. Complaint Exhibit A, R.1-4, Page ID##29-31. The Michigan statute has not changed in any way since its 2005 adoption and, "[t]hus, Michigan CPL holders could purchase firearms with their CPLs in lieu of a NICS check for many years." Order, R.70, Page ID#1404.

By 2017, however, ATF and the FBI learned that, while Michigan was conducting NICS checks prior to granting CPLs, the State was not conducting them *the way the federal agencies would like*. Specifically, for a small number of NICS checks (a few dozen out of hundreds of thousands) that "showed a potential prohibiting condition," the Michigan State Police ("MSP") was not "conduct[ing] follow-up research to make conclusive legal determinations on federal disqualifications when NICS lacked such a determination." Order, R.70, Page ID#1405. Although after negotiations, MSP initially agreed to perform

3

investigations, make determinations, and "'enter those in the NICS Indices database'" for use in future NICS checks, by 2019 MSP reported that its "'direction … ha[d] changed' … following the recent election of Attorney General Dana Nessel." *Id.* So, while declining to make final legal determinations as to the scope of federal law, Michigan now offered to "gather relevant records … and refer that information to NICS" but requested that the FBI then "make and enter the final determination...." Agency Record, R.16-1, Page ID#108. But the FBI refused, so eventually several dozen pending CPL applications "were 'pushed to the county clerks,'" and "50 of those applications were approved, leading the FBI to conclude that" CPLs had been "issued to persons with a potential [misdemeanor crime of domestic violence ("MCDV")] prohibition." Order, R.70, Page ID##1405-1406.

On March 3, 2020, ATF issued a "Public Safety Advisory to All Michigan Federal Firearms Licensees" ("PSA"). *Id.* at Page ID#1407. The PSA "rescinded [ATF's] March 2006 Open Letter," and warned that Michigan CPLs were no longer considered a valid Brady Alternate. *Id.* ATF simultaneously sent a letter to the Michigan Attorney General demanding "a list of 'corrective measures' that Michigan must take before the Michigan CPL could qualify as a Brady Alternate again." *Id.*

## Proceedings Below

Donald J. Roberts, II ("Roberts") and Gun Owners of America, Inc. ("GOA") (together, "Plaintiffs") filed suit on March 9, 2020. Complaint, R.1, Page ID##1-21.

Roberts is a law-abiding Michigan permit holder who attempted to, in accordance with a statutory exemption, rely on his state-issued CPL to acquire a firearm. Order, R.70, Page ID#1408. And GOA represents many other Michigan gun owners like Roberts. Defendants filed the administrative record (R.16), the parties stipulated to the facts (Plaintiffs' Motion for Summary Judgment ("First MSJ"), R.17, Page ID##411-413), and the parties briefed cross-motions for summary judgment. R.17, 21, 23, 24. The thrust of Plaintiffs' argument was that the federal statute – which looks to what "the law of the State provides" – requires an analysis of nothing more than the four corners of the Michigan statute which, in this case, clearly does what federal law demands. First MSJ, R.17, Page ID#418. For their part, Defendants argued that, even though the Michigan statute remained unchanged, nevertheless "Michigan legal counsel … revised their interpretation of Michigan law," and thus "Michigan [l]aw [h]as [c]hanged." Defendants' Cross-Motion for Summary Judgment ("First XMSJ"), R.21, Page ID##460, 469.

On December 17, 2020, the district court issued an Order granting Defendants' motion and denying Plaintiffs' motion. 2020 Order, R.25, Page ID##546-571 (reported at *Roberts v. DOJ*, 507 F. Supp. 3d 864 (E.D. Mich. 2020)). The court believed that Defendants' "interpretation of §922(t)(3) is consistent with the text, design, and purpose of the Brady Act," while "Plaintiffs' interpretation ... is neither textually nor substantively sound." *Id.* at Page ID##560, 561. According to

the court, the statutory language "the law of the state" includes not only the text of a state statute but also any "'binding custom or practice of a community,' 'a rule of conduct or action prescribed … or formally recognized as binding or enforced by a controlling authority,' and 'the whole body of such customs, practices or rules.'" *Id.* at Page ID#561. This, the court determined, "would seem to include the practices and interpretations of state officials...." *Id.* According to the court, this prevents States from "feign[ing] compliance with the Brady Act by enacting statutes that they ha[ve] no intention of enforcing." *Id.* at Page ID#562. Thus, finding that "Michigan's position changed" based on guidance from "MSP legal counsel," the court concluded that "'the law of the State'" of Michigan had changed even though the statute remained the same. *Id.* at Page ID##567, 554, 562. Therefore, the court reasoned, it was not an abuse of discretion for ATF to rescind the Michigan CPL as a Brady Alternate. *Id.* at Page ID#569. As the district court reasoned, ATF "cannot excuse Michigan's noncompliance." *Id.* at Page ID#566.

Plaintiffs appealed to this Court. After briefing and oral argument, this Court vacated the district court's decision and remanded for further proceedings. Per Curiam Opinion, No. 21-1131 R.35-2, Page ##1-10 (reported at *Gun Owners of Am., Inc. v. DOJ*, 2021 U.S. App. LEXIS 33554 (6th Cir. Nov. 9, 2021)) ("Per Curiam Opinion"). Taking what the district court styled "a more critical view of the ATF's 2020 PSA and its administrative record" (Order, R.70, Page ID#1409), this Court

flatly rejected Defendants' "far-reaching position … on what state officials must do to ferret out state-law misdemeanor convictions that may implicate federal prohibitions." Per Curiam Opinion at 7. Rather, as the Court noted, requiring "the investigation by the Michigan State Police of *all* facts that might bear on the mismatch problems … is not what the Brady Act says." *Id.* at 8. Noting the "difficult matching problems" inherent in making complex determinations about the application of federal law to state law convictions, especially potential MCDV convictions, the Court explained that "[w]e cannot take one phrase ('verify that the information available') and give it a different, and far more burdensome, meaning ('verify that the circumstances of the underlying offense do not violate federal law'). No such directive appears in the statute." *Id.* at 7, 8. Rather, as the Court summarized, "the mere presence of erroneous permit grants in the past" does not authorize ATF "to remove a State from the eligibility list." *Id.* at 8.

But although "refus[ing] to adopt the ATF's interpretation" (Order, R.70, Page ID#1409), this Court believed that Plaintiffs' singular focus on the text of Michigan law "is a bridge too far." Per Curiam Opinion at 6. Although agreeing with Plaintiffs that "Michigan law seems to do what the federal law requires" and that "[h]istory suggests a similar conclusion," this Court nevertheless reasoned that, although the text of state law "usually will suffice by itself," "that may not always be the case" because "[t]here could, for example, be a state-court decision that dilutes the

apparent meaning of the statute or perhaps an opinion by the Michigan Attorney General that casts light on the statute." *Id.* at 6-7. But noting that "ATF has not shown a state-court decision that contradicts or undermines the state statute," and "has not obtained an opinion of the Michigan Attorney General to like effect," the Court remanded for the parties and the district court to address "several follow-up questions...." *Id.* at 9.

This Court's remand to the district court lasted nearly three years. After ordering briefing on the scope of post-remand discovery (Feb. 15, 2022 Order, R.34, Page ID#593), the district court adopted Defendants' approach and rejected Plaintiffs' "decidedly more expansive" proposal (May 27, 2022 Order, R.39, Page ID#643). The district court thus ordered (i) the parties to invite the Michigan AG to file briefing in the case, followed by (ii) Defendants supplementing the record and (iii) Plaintiffs filing any objections. *Id.* at Page ID##646-647. The district court refused Plaintiffs' request to subpoena the Michigan Attorney General for records of communications between that office and Defendants. R.40, Page ID#649; R.42, Page ID#695. The district court also refused Plaintiffs' request to certify the question to the Michigan Supreme Court. *Id.*

The State of Michigan submitted an amicus brief on September 30, 2022, detailing Michigan's understanding of federal and state law, but without providing any insight into the Michigan AG's position contemporaneous with ATF's 2020

PSA. R.45, Page ID#704. Defendants subsequently filed a supplemented administrative record, including new agency declarations and also Michigan's September 2022 amicus brief. R.46, Page ID#728. After Plaintiffs objected to Defendants' supplementation and sought further supplementation (R.47, Page ID#1088)), the district court struck Michigan's amicus brief from the administrative record because it "does not address her position on the obligations of the MSP *at the time of the challenged agency* action...." Sept. 27, 2023 Order, R.55, Page ID#1165 (emphasis original). And, although declining to order Defendants to supplement the record with various documents Plaintiffs identified (R.55, Page ID##1166-70), the district court nevertheless agreed that "the record is [still] not clear about whether the Michigan Attorney General ever arrived at a final decision on the issue before the ATF issued the challenged PSA." *Id.* at Page ID#1170. To that end, the district court ordered Defendants – *again* – "to supplement the record with at least one additional affidavit from a knowledgeable ATF or FBI employee addressing … four inquiries related to their understanding of the Michigan Attorney General's legal position": (i) "[w]hen" and (ii) "[h]ow ATF became aware of the Michigan Attorney General's changed position," (iii) "[w]hat" communications ATF had "with the Michigan Attorney General … regarding the issue," and (iv) "[w]hether ATF ever received communication … that the Michigan Attorney General had rendered a final decision on the issue." *Id.* at Page ID#1171. Given the opportunity for a third bite

at the apple, Defendants then filed a further round of supplemental declarations on November 14, 2023, along with two pages of heretofore unproduced handwritten notes. R.58, Page ID#1195.

Thereafter, the parties engaged in a second round of summary judgment briefing that culminated on March 11, 2024. R.60, 63, 64, 66, 67, 69. As Plaintiffs explained it, even "after all of Defendants' new submissions and declarations attempting to justify their actions, no evidence of a Michigan AG opinion has been found." Plaintiffs' Motion for Summary Judgment ("Second MSJ"), R.60, Page ID#1237; *see also* Second Declaration of Eric M. Epstein, R.58-1, Page ID#1207 ¶29 (conceding that "ATF never received a communication from … anyone … that the Michigan AG had rendered a formal opinion"). Rather, Plaintiffs noted, Defendants' supplemental filings "attempt to muddy the waters" (Second MSJ, R.60, Page ID#1237) with unsupported inferences drawn from vague hearsay, but which ultimately lead back to the conclusion this Court already reached: "[a]ll [ATF] has are ostensible statements by unidentified individuals … who spoke to unidentified people...." Per Curiam Opinion at 9.

In their cross-motion for summary judgment, Defendants argued – for the first time in the trial court in nearly four years– that "Plaintiffs [l]ack Article III [s]tanding." Defendants' Cross-Motion for Summary Judgment ("Second XMSJ"), R.63, Page ID#1288. Otherwise, Defendants largely regurgitated the arguments

previously raised and rejected by this Court – namely that "Michigan law has changed" because unidentified low-ranking MSP officials changed procedure,[2] and that the statutory phrase "verify that information available" means that state officials must look far beyond the information available in NICS.[3]

On September 27, 2024, the district court issued an Order again denying summary judgment to Plaintiffs and again granting it to Defendants. R.70. After laying out the considerable procedural history of the case, the district court determined that, in fact, it need not answer any of this Court's "follow-up questions" or otherwise resolve the legality of ATF's 2020 PSA, on the theory that Plaintiffs lacked standing to challenge ATF's actions all along. *Id.* at Page ID#1412. According to the court, "Roberts does not demonstrate a cognizable injury-in-fact," because his "injury is not concrete" in that, "by all indications, had Roberts completed Form 4473, he would have promptly passed the NICS check and left the FFL with a new firearm the same day." *Id.* at Page ID##1413-1414. Thus, according to the district court, Roberts' only injury was "that he could not purchase a firearm *the way that he wanted to* – with his CPL instead of a Form 4473 – which *is not* a concrete injury." *Id.* at Page ID#1414. Without reference to (i) the supplemental briefing *on standing* ordered by this Court (September 8, 2021 Ruling Letter, No.

---

[2] *Cf.* Second XMSJ, R.63, Page ID#1297, *with* Per Curiam Opinion at 9.
[3] *Cf.* Second XMSJ, R.63, Page ID#1293, *with* Per Curiam Opinion at 7-8.

21-1131, R.22), (ii) this Court's statements about standing at oral argument (Oct. 26, 2021 Oral Argument, No. 21-1131 ("Arg.")[4]), and (iii) the language in this Court's prior opinion supporting Plaintiffs' standing (Per Curiam Opinion at 1), the district court concluded that neither Roberts nor GOA (of whom Roberts is a member) have standing, and dismissed Plaintiffs' Complaint. Order, R.70, Page ID#1417. Plaintiffs timely appealed to this Court on October 8, 2024. Notice of Appeal, R.72, Page ID#1420.

## SUMMARY OF ARGUMENT

Unfortunately, this Court's three-year remand to the district court has borne little fruit. Although at first refusing to participate in the litigation, the State of Michigan at long last submitted an amicus brief detailing the state's interpretation of state law. But as the district court correctly noted, that 2022 filing explains nothing about the Michigan Attorney General's position *circa 2020*, and does not establish that any formal opinion was ever adopted – much less communicated to Defendants. Thus, Michigan's belated submission provides no support for an ATF action taken more than two-and-a-half years prior.

Aside from that, and despite gratuitous opportunities to do so, Defendants have offered nothing to bridge the gap. To be sure, Defendants have now unearthed two pages of cryptic handwritten notes by a former government employee, and rely

---

[4] https://tinyurl.com/bx47mpsr.

on a document they previously assured the district court they did not possess (R.64, Page ID##1331-32). But all Defendants can muster from these additional sources is what they already had – "appear[ances]," "suggest[ions]," "indicat[ions]," and "interpret[ations]" (R.64, Page ID##1313, 1325, 1326, 1328) divined in self-serving declarations of third parties who were not present to witness the alleged hearsay. At the end of the day, Defendants are forced to throw up their hands and admit that "ATF never received a communication from … anyone … that the Michigan AG had rendered a formal opinion."

Not a problem, says the district court, because Defendants still emerge victorious. According to the district court, it was not necessary to answer this Court's "follow-up questions" or engage with the parties' "legal arguments." Instead, the district court chose 'door number three,' determining for the first time in nearly five years of litigation that Plaintiffs never had standing to challenge ATF's decision in the first place. But in reaching this conclusion, the district court failed to acknowledge that "whether the plaintiffs have standing in this matter" was top of mind for this Court, which went so far as to order supplemental briefing *on that very issue* before rendering its decision. The district court similarly glossed over this Court's focus on standing during a lengthy oral argument, including statements that Defendants' standing arguments were "bonkers," "astonishing," and "silly." But what appeared "bonkers" to this Court's Chief Judge was apparently self-evident to

the district court, which ignored this Court's prior opinion that "Federal law once exempted Michigan permit holders like Roberts," who is now "caught between governments and deterred by the new background-check obstacle." Not only was the district court's startling conclusion that Plaintiffs lack standing legally erroneous, but also it was foreclosed by this Court's prior opinion.

As this case approaches its five-year anniversary, Plaintiffs (and all Michigan CPL holders) continue to be irreparably harmed by ATF's arbitrary and capricious actions. Meanwhile, the record is as painfully clear now as it was then – ATF never had, and has been unable to establish, any legal basis for its actions. This Court should – again – vacate the district court's opinion. But this time, rather than remanding, this Court should vacate ATF's 2020 PSA.

## STANDARD OF REVIEW

This Court "reviews de novo a district court's grant of summary judgment and dismissal for lack of standing." *McKay v. Federspiel*, 823 F.3d 862, 866 (6th Cir. 2016); *Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*, 542 F.3d 529, 534 (6th Cir. 2008). Likewise, this Court reviews issues of statutory interpretation *de novo*. *United States v. Miller*, 734 F.3d 530, 539 (6th Cir. 2013); *United States v. White*, 846 F.3d 170, 174 (6th Cir. 2017).

## ARGUMENT

## I.     PLAINTIFFS HAVE STANDING.

"Standing is a threshold inquiry which [this Court] must consider prior to reaching the merits of an appeal." *T.H.E. Ins. Co. v. Naghtin*, 916 F.2d 1082, 1084 (6th Cir. 1990). There is an "irreducible constitutional minimum of standing contain[ing] three elements:"

> (1) "the plaintiff must have suffered an 'injury in fact' — an invasion of a legally protected interest which is (a) concrete and particularized ... and (b) 'actual or imminent, not conjectural or hypothetical,'" (2) that injury must be "trace[able] to the challenged action of the defendant, and not ... the result of the independent action of some third party," and (3) "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" [*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotations omitted).[5]]

In dismissing Plaintiffs' Complaint for the second time, the district court concluded that Plaintiffs have never had standing to bring this challenge.[6] According to the

---

[5] A nonprofit organization like GOA can establish representational standing to sue when "[i] its members would otherwise have standing to sue in their own right, [ii] the interests at stake are germane to the organization's purpose, and [iii] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). Indisputably, the statutory interests (and constitutional rights) sought to be protected in this case (the ability to acquire firearms) are pertinent to (indeed, they are at the core of) GOA's mission, which exists "to preserve, protect, and defend the Second Amendment rights of gun owners." Complaint, R.1, Page ID#2, ¶4. Likewise, since the injuries suffered by GOA's members (the inability to use a valid Michigan permit to obtain a firearm in lieu of a NICS check as Congress provided) are virtually identical between gun owners, the individual participation of each such person is not required here, as GOA will fully represent their interests.

[6] For their part, Defendants never challenged Plaintiffs' standing in this case until asked to brief the issue by this Court. Arg. 20:15 ("You did not raise standing below. My recollection is you raised standing when we asked you about it.").

district court, "Roberts does not demonstrate a cognizable injury-in-fact, the first standing element," because his "injury is not concrete." Order, R.70, Page ID#1414. This was because, as the district court theorized, "by all indications, had Roberts completed Form 4473, he would have promptly passed the NICS check and left the FFL with a new firearm the same day." *Id.*; *see also* Second XMSJ, R.63, Page ID#1290 ("the mere act of undergoing a background check itself cannot give rise to standing."). Thus, the district court distilled Plaintiffs' claim down to a "purported injury … that [Roberts] could not purchase a firearm *the way that he wanted to*— with his CPL instead of a Form 4473—which *is not* a concrete injury." Order, R.70, Page ID#1414. That holding was erroneous, for numerous reasons.[7]

## A. ATF's 2020 PSA Harmed Plaintiffs by Revoking an Acquired Benefit.

At oral argument in Plaintiffs' prior appeal to this Court, Chief Judge Sutton elucidated the nature of the harm Plaintiffs have suffered from ATF's 2020 PSA. After government counsel noted that a court must find an Article III injury even in the face of a congressional statute,[8] Judge Sutton likened Section 922(t)(3) to a

---

[7] In addition to meeting the "constitutional requirements of standing," a plaintiff "seeking judicial review of agency action under the APA" also must seek to protect an interest "'arguably within the zone of interests to be protected or regulated by the statute … in question.'" *Courtney v. Smith*, 297 F.3d 455, 460-61 (6th Cir. 2002). It is beyond dispute that Plaintiffs' interest in using a Brady Alternate is within the "zone of interests" protected by Section 922(t)(3), which allows for just that.

[8] To be sure, "Congress's creation of a statutory prohibition or obligation … does not relieve courts of their responsibility to independently decide whether a

16

statutory choice between a temporary federal "free speech permit" which must be continually renewed, and a state permit which "has the virtue of lasting five years," opining that it would be "bonkers" if a plaintiff were not permitted to challenge an agency's elimination of the state permit option. Arg. 19:36.[9]

Indeed, while a NICS background check applies only to a single firearm(s) transaction, and irrespective is good for only "30 calendar days" (27 C.F.R. § 478.102(c)), a CPL issued after that same NICS check is valid for between four and five years. *See* MCL § 28.425l(1); *see also* Arg. 46:37 ("five years without risk of losing access to guns, right?  Because I think the federal government agrees that an intervening prohibited conviction wouldn't destroy the five-year permit."); at

---

plaintiff has suffered a concrete harm...." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 426 (2021). But the fact that a harm is perceived by a court to be "brief" does not mean it is not concrete. Plaintiffs here are not "merely seeking to ensure a defendant's 'compliance with regulatory law'" in the abstract. *Id.* at 427. Nor do they – as the district court characterized it – seek merely to purchase a firearm "the way [they] want[]" (Order, R.70, Page ID#1414), but rather to vindicate their statutory interest to purchase a firearm *the way Congress provided*. ATF's denial of Plaintiffs' ability to do so presents "a real controversy with real impact on real persons." *Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 19, 87 (2019) (Gorsuch, J., concurring in the judgment). For the same reason, Plaintiffs' injury is "particularized," affecting a class of Michigan gun owners with qualifying permits.

[9] *See also* at 21:01 ("That's valuable to somebody because once you have it, you get it no matter what happens in the intervening years.  That has value.  There's a reason for doing it."); at 22:44 ("what is speculative about saying I have a constitutional right to have a gun?  The federal government has said there are two ways to buy the gun.  They're taking away one of those ways including the local way … what else is needed?"); 23:24 (summarizing Plaintiffs' contention that Defendants "violated the law by taking away a permitting option that they want to use, and the Congress expressly gave them").

47:22 (DOJ admitting "[i]t could be a potential benefit"). As the FBI puts it, "[a] person with an active qualified permit is not required to have another NICS background check."[10] Thus, unless and until a CPL is revoked, the permit holder is *guaranteed* the ability to acquire firearms from FFLs without federal involvement, delay, or interruption, simply by presenting a qualifying state permit.[11] The certainty of that guarantee constitutes a real benefit – one that the 2020 PSA has taken away.[12]

Certainly, Congress believed itself to be conferring a benefit on state permit holders, going out of its way to enact 922(t)(3). *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016) ("because Congress is well positioned to identify intangible harms that meet minimum Article III requirements, its judgment is also instructive and important."). Likewise Michigan, which enacted the current version of MCL

---

[10] https://www.fbi.gov/how-we-can-help-you/more-fbi-services-and-information/nics/about-nics.

[11] Although Michigan is not, many states operate as a "point of contact" between the FFL and the NICS system, which includes charging a fee for processing a NICS check. *See, e.g.*, Tenn. Code Ann. § 39-17-1316(e)(1) ($10 fee). Using a Brady Alternate permit avoids such fees.

[12] In contrast, being at the constant mercy of the NICS system places one at risk of (1) the numerous times the NICS system is nonoperational, (2) delay, (3) denial (right or wrong), (4) and warrantless monitoring of firearm purchases. *See* E. Miller, "Documents Show FBI and ATF Warrantless Surveillance Through Gun Background Checks, Jan. 17, 2023, Epoch Times, https://tinyurl.com/2ns5nv4z. For example, in 2019, the Congressional Research Service reported that "[n]early one-fifth … of FBI NICS Section-administered background checks … are delayed...." *See* https://crsreports.congress.gov/product/pdf/R/R45970, at 12. And out of 25,043 appeals of NICS denials, 7,471 denied transactions were overturned on appeal. *See* https://www.fbi.gov/file-repository/nics-2022-operations-report.pdf/view, at 22.

§ 28.426(2) expressly "[t]o align the state statute … with [] federal law" (2020 Order, R.25, Page ID#552), sought to acquire that congressional benefit for its residents. And Michigan Attorney General Bill Cox, who wrote a letter to ATF in 2006 seeking confirmation that the Michigan statute qualified as a Brady Alternate, also clearly believed the Brady Alternate to be important enough to seek ATF's agreement to the exemption. Finally, those who spend the time and money to acquire Michigan CPLs have *paid for* Congress's guarantee of the ability to acquire firearms for a subsequent period of time.[13] *See* Arg. 21:15 ("There's a reason for doing it."). In other words, Plaintiffs are not "merely seeking to ensure a defendant's 'compliance with regulatory law'...." *TransUnion*, 594 U.S. at 427.

It is black-letter law that the denial or revocation of a governmental benefit constitutes Article III injury. *See, e.g.*, *Clinton v. City of New York*, 524 U.S. 417, 433 n.22 (1998); *see also Crossroads Grassroots Pol'y Strategies v. FEC*, 788 F.3d 312, 317 (D.C. Cir. 2015) ("Our cases have generally found a sufficient injury in fact where a party benefits from agency action, the action is then challenged in court, and an unfavorable decision would remove the party's benefit."); *ACLU v. Santillanes*, 506 F. Supp. 2d 598, 620 (D.N.M. 2007) (loss of statutory option to vote in person

---

[13]   As was noted at oral argument previously, an enumerated right – the right to acquire a firearm – lurks in the background. *See* Arg. 43:10. The constitutional significance of the subject matter here thus further shows that a "case or controversy" exists here.

at polling place is injury that confers standing), *rev'd on merits*, 546 F.3d 1313 (10th Cir. 2008).[14]  And the removal of one of the key benefits of a license – perhaps the main reason some gun owners obtain that license in the first place – constitutes Article III injury the same way that denial of the underlying license itself would. *See, e.g.*, *Leander Indep. Sch. Dist. v. DOI*, 2022 U.S. Dist. LEXIS 240533, at \*8 (W.D. Tex. Dec. 21, 2022) ("A license or permit denial pursuant to a state or federal administrative scheme suffices as an Article III injury."); *Celona v. Erickson*, 270 F. Supp. 3d 473, 480 (D. Mass. 2017) ("It is well-settled that the denial of a firearms license constitutes an injury that satisfies the minimum requirements of Article III standing.").  If the denial of a permit establishes standing, then surely the denial of *the benefits of* that permit does too.

At bottom, Defendants have deprived Plaintiffs of one of the benefits of their Michigan CPLs.  That is an Article III injury.  Plaintiffs' injury is not some hypothetical, but rather is both "actual" (having already occurred) and "imminent" (certain to occur again), as both Roberts and GOA's members with qualifying Michigan permits have been and continue to have their CPLs disqualified as a NICS alternative when buying firearms at an FFL, despite Congress specifically

_____

[14] In that case, the Defendants argued, much like the government below, that "[t]he mere 'offense' in having to vote absentee is insufficient to confer Article III standing." https://tinyurl.com/y49jtrbx.  In other words, the plaintiff was simply not able to vote "*the way that he wanted to.*"  Page ID#1414.  As noted, that argument was rejected.

enumerating an alternate pathway for those with a state permit to bypass a NICS check.  Until ATF's 2020 PSA is vacated, no one in Michigan with a CPL will be able to benefit from the path Congress provided.

**B. Case Law Supports Plaintiffs' Standing.**

At oral argument during Plaintiffs' prior appeal to this Court, Defendants relied on *Spokeo* and *TransUnion*.  Those cases stand for the simple proposition that Congress cannot conjure Article III standing from thin air, declaring a person to have been injured and granting him standing to sue in federal courts which possess only the power to decide "cases or controversies."  Otherwise, "Congress could authorize virtually any citizen to bring a statutory damages suit against virtually any defendant who violated virtually any federal law."  *TransUnion*, 594 U.S. at 428.  But at the same time, "Congress may 'elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate,'" or "'define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before.'"  *Spokeo*, 578 U.S. at 341 (citations omitted).

Regardless, neither case provides substantial guidance here.  *Spokeo* involved "a statute grant[ing] a person a statutory right and purport[ing] to authorize that person to sue to vindicate that right."  *Id.* at 341.  Similarly in *TransUnion*, "[t]he Act creates a cause of action for consumers to sue and recover damages for certain violations."  594 U.S. at 419.  Thus, both "are cases where Congress purported to

create an injury through a cause of action and then award damages for their decision that that was an injury." Arg. 18:49. Moreover, both cases involved litigation between private parties. In stark contrast, Section 922(t)(3) confers a real benefit on certain state permit holders – allowing them to use certain qualifying permits to bypass federal requirements imposed on other gun buyers. And this case involves an APA challenge to the actions of a federal agency that regulates the exercise of a constitutionally enumerated right.

Aside from the general propositions of *Spokeo* and *TransUnion*, neither Defendants nor the district court below were able to point to any compelling (much less controlling) authority to support their claim that Plaintiffs lack standing. *See* Arg. 28:50 ("I don't see any appellate cases that support this and I really find [Defendants' standing] proposition pretty astonishing."). Both Defendants and the district court cited only to *Lee v. DOJ*, 554 F. Supp. 3d 1228 (N.D. Ala. 2021), and *Robinson v. Sessions*, 721 F. App'x 20, 24 (2d Cir. 2018). Second XMSJ, R.63, Page ID#1290; Order, R.70, Page ID#1414. But *Robinson*, an unpublished opinion, did not involve a challenge to the NICS background check, but rather asserted constitutional violations when NICS "cross-reference[d] personal information with the Terrorist Screening Database ('TSDB')." *Robinson*, 721 F. App'x at 21. The *Robinson* plaintiffs did not object to the NICS check itself, but merely to the fact that the terrorism database was queried as part that process. The Second Circuit rejected

their claim, noting the plaintiffs "do not claim to be listed in the TSDB" and thus "fail to identify a direct injury in fact that they have sustained or will sustain as a result of … the inclusion of TSDB data in" NICS. *Id.* at 23. In contrast, Plaintiffs here do not merely challenge some esoteric nuance in the way that NICS checks are performed behind the scenes – rather, they object to having to submit to a NICS check at all. And quite unlike *Robinson*, where Congress *expressly granted authority* to the FBI to establish and operate the NICS system, including determining what sorts of information would be queried (34 U.S.C. § 40901), here Congress *expressly withheld authority* from ATF to require those with CPLs to undergo a NICS check (18 U.S.C. § 922(t)(3)(B)). *Robinson* certainly does not support the district court's conclusion.

While *Robinson* is inapposite, the Alabama court's decision in *Lee* is unpersuasive for the reasons discussed *infra*. At issue there was a challenge to ATF's July 22, 2019 "Public Safety Advisory" issued to Alabama FFLs, purporting to revoke the 18 U.S.C. § 922(t)(3) exemption for Alabama concealed carry permits. Like the district court below, the *Lee* court concluded that the plaintiff did not have standing because she had not been entirely "precluded [or] denied … from purchasing a firearm," but merely "was refused the ability to purchase a firearm *the way she wanted.*" *Lee*, 554 F. Supp. 3d at 1234 (emphasis added). The court concluded that having to "fill[] out the ATF 4473 Form and wait[] a few minutes for

her information to clear" is "'a brief, inconsequential annoyance'" insufficient to establish legal standing. *Id.* at 1235. And in support of its conclusion, the Lee court pointed only to *Robinson*, which is inapposite for the reasons just discussed.

Aside from *Robinson* and *Lee*, Plaintiffs are not aware of any authority even remotely supporting the district court's conclusion that imposition of an unlawful federal background check does not constitute an Article III injury. On the contrary, numerous courts have permitted challenges to background check requirements, either explicitly finding standing to exist or remaining silent on the issue. *See, e.g.*, *Rocky Mountain Gun Owners v. Hickenlooper*, 371 P.3d 768, 770 (Colo. App. 2016) ("[t]he district court concluded that most of the plaintiffs had standing" to challenge "expanded mandatory background checks,"); *City of Missoula v. Fox*, 450 P.3d 898 (Mont. 2019) (striking down a city's background check requirement); *Elhert v. Settle*, 105 Va. Cir. 326 (Lynchburg 2020) (striking down in part Virginia's newly enacted universal background check); *Rhode v. Becerra*, 445 F. Supp. 3d 902, 927 (S.D. Cal. 2020) ("[T]he individual plaintiffs clearly have standing because they have demonstrated a direct injury of having to undergo eligibility checks for every [ammunition] purchase...."), *vacated, remanded sub nom. Rhode v. Bonta*, 2022 U.S. App. LEXIS 32554 (9th Cir. Nov. 17, 2022), *standing ruling reiterated*, 713 F. Supp. 3d 865, 872 (S.D. Cal. 2024) ("Plaintiffs continue to have Article III standing."), *stayed pending appeal*, Order, No. 24-542 (9th Cir. Feb. 5, 2024), ECF #8.1; *Mitchell*

*v. Atkins*, 483 F. Supp. 3d 985, 991 (W.D. Wash. 2020) (upholding Washington State's background check requirement for "semiautomatic assault rifles"), *vacated, remanded*, 2022 U.S. App. LEXIS 33735 (9th Cir. Dec. 2, 2022), *ruling reiterated*, 2024 U.S. Dist. LEXIS 31563, at *10 (W.D. Wash. Feb. 23, 2024); *Liberty Initiative Fund v. Thurston*, 2022 U.S. Dist. LEXIS 68615, at *22 (E.D. Ark. Apr. 13, 2022) ("Plaintiffs have stated a claim that the … background check requirement … violate[s] Article 5, Section 1...."); *Sgaggio v. Polis*, 2023 U.S. Dist. LEXIS 116080, at *11 (D. Colo. July 6, 2023) (presupposing that imposition of a background check causes an "actual or imminent injury"); *Gazzola v. Hochul*, 88 F.4th 186, 203 (2d Cir. 2023) (plaintiff lacked standing to challenge an background check for *buyers* because, as an ammunition *seller*, the law "does not require him to undergo a background check when he purchases ammunition"); *N.Y. State Firearms Ass'n v. James*, 2024 U.S. Dist. LEXIS 80568, at *12 (W.D.N.Y. May 2, 2024) ("Plaintiffs have standing to challenge the background check process.").

**C. The District Court's Conclusion Invites Absurd Results.**

Even though Congress considered Section 922(t)(3)'s exemption a significant enough benefit to codify into federal law, the district court permitted ATF to eliminate that statutory exemption and impose a NICS check upon Plaintiffs – on the theory that a background check is only a minor inconvenience to obtaining a firearm which did not "prevent[] [Roberts] from buying a firearm without undue

delay...." Order, R.70, Page ID#1414. The implications of this holding – that ATF may unilaterally establish background checks, including ones that Congress explicitly said are not required – are startling.

First, if ATF may create and impose background checks without any authorization, then ATF could simply decide tomorrow to eliminate Section 922(t)(3) exemptions in every state that has them.[15] Even though this would clearly violate Section 922(t)(3)(A), gun owners would be powerless to challenge ATF's actions, because Defendants would argue that there is ultimately no "disruption to [the] ability to buy a firearm." DOJ Reply Brief, R.69, Page ID#1390. Likewise, ATF could eliminate Section 922(t)(3)(B)'s exception, which eliminates NICS checks for transfers of National Firearm Act weapons like silencers and machineguns where, much like in Section 922(t)(3), a background check has already previously been performed.

Second, the district court's conclusion would mean that no legal challenge could ever be brought to Section 922(t)'s background check requirement, because the mere act of having to undergo a background check "without undue delay" would never create an injury sufficient to establish standing. Unsurprisingly, this is not the law, as courts around the country have permitted all sorts of challenges to

---

[15] *See* https://www.atf.gov/rules-and-regulations/permanent-brady-permit-chart.

background checks.  *See* I(B), *supra*.

Third, ATF could abuse its newfound power outside the Section 922(t) context.  For example, although federal law does not require a NICS check for a non-commercial private sale by an unlicensed person, ATF could simply – by regulatory fiat – mandate that even private sales of firearms must occur through the NICS system.  And, by that logic, why stop at firearms?  If ATF were to issue a letter to Walmart – holding FFLs in every state – ordering it conduct background checks on buyers of BB guns – or Nerf guns, or squirt guns – there would be no standing, because the "obligation to complete [a] Form 4473 and undergo a NICS background check at an FFL [is not] a concrete injury," but instead merely an "abstract annoyance[]."  Order, R.70, Page ID##1414, 1415.  Rather, all it would mean is that a buyer "could not purchase a [squirt gun] *the way that he wanted to*."  *Id.* at Page ID#1414.

And why stop at the ATF?  For example, if the TSA – without any act of Congress – were unilaterally to require all travelers to pass a NICS background check in order to fly, it seems unlikely that any court would conclude that those who can pass the background check lack standing to challenge it.  That cannot be the law – and courts have rightly concluded that it is not.  *See, e.g.*, *Antonyuk v. James*, 2024 U.S. App. LEXIS 26958, at *67 (2d Cir. Oct. 24, 2024) (challenging "a portion of the application *process*" because "injury flows from the application itself," even if

the application would be approved).

### D. This Court's Prior Opinion Establishes Plaintiffs' Standing.

As the district court was eager to point out, this Court did not make an explicit ruling on Plaintiffs' standing in so many words. Nevertheless, the Court clearly believed that Plaintiffs had standing, or else it would not have issued the opinion it did. *See Barry v. Lyon*, 834 F.3d 706, 714 (6th Cir. 2016) ("Standing is a threshold question in every federal case...."). Even so, the district court claimed that "neither this Court nor the Sixth Circuit's prior decisions held *or confirmed* that Roberts has standing." Order, R.70, Page ID#1416 (emphasis added). But the record is replete with evidence to the contrary.

First, implicit in the district court's previous denial of summary judgment is a finding that Plaintiffs had standing to challenge the 2020 PSA. *See* 2020 Order, R.25, Page ID#569 (emphasis added) ("Plaintiffs' allegations are *wrong on the merits*."). Second, prior to oral argument in Plaintiffs' first appeal, this Court ordered supplemental briefing specifically on the issue of standing, at which point it was made aware of *Robinson* and *Lee*. No. 21-1131 R.22, 25, 26. Third, with standing top of mind at oral argument in October of 2021, this Court devoted significant time to the issue, with Chief Judge Sutton describing Defendants' sudden contention that Plaintiffs could not even challenge the 2020 PSA as "bonkers," "astonishing," and "silly." Arg. 19:48, 23:54, 31:43. And fourth, after fulsome briefing and argument

on the issue, this Court did not dismiss Plaintiffs' appeal for lack of standing, but rather proceeded to address the parties' substantive arguments. Rather than failing to "confirm[] that Roberts has standing" (Order, R.70, Page ID#1416), this Court observed at the outset that Roberts was "[c]aught between governments and deterred by the new background-check obstacle...." Per Curiam Opinion at 1. It seems obvious that this Court viewed the new "obstacle" imposed by the 2020 PSA as conferring standing on Plaintiffs.

For these reasons, this Court already established Plaintiffs' standing, and the district court erred in deciding otherwise. As this Court once observed, "courts should not 'reconsider a matter once resolved in a continuing proceeding,'" in order "to ensure that 'the *same* issue presented a second time in the *same case* in the same court should lead to the *same result*.'" *Howe v. City of Akron*, 801 F.3d 718, 739 (6th Cir. 2015). Following Plaintiffs' first appeal, nothing has changed with respect to Defendants' promulgation of the 2020 PSA or its deprivation of Plaintiffs' statutory benefits. Defendants certainly did not withdraw their PSA, nor did Plaintiffs suddenly become ineligible to purchase or possess firearms. Thus, absent a claim of mootness or any other intervening circumstance which might have altered this Court's prior confirmation of Plaintiffs' standing, such confirmation should have controlled below.

Discounting Plaintiffs' argument as "[c]lever" but nevertheless "far-

reaching," the district court surmised that Plaintiffs' argument would impermissibly preclude contesting standing at summary judgment in a hypothetical case where an appellate court reversed dismissal of a complaint "*without anyone raising a standing issue*" on appeal or before. Order, R.70, Page ID#1416 (emphasis added). In such a case, the district court concluded, "no one could raise standing at summary judgment, even if the plaintiff lacked standing." *Id.* But "clever" as the district court's hypothetical may be, it is not what occurred in this case. Rather, this Court *did* "rais[e] a standing issue" *sua sponte* on appeal, having ordered supplemental briefing and devoted oral argument time to the issue. And as this Court explains, "we have an independent obligation to assure ourselves of our own jurisdiction" on appeal, *Kerchen v. Univ. of Mich.*, 100 F.4th 751, 759 (6th Cir. 2024), and "[w]e cannot assume jurisdiction for the purpose of deciding the merits of the case." *Sheldon v. Vilsack*, 538 F. App'x 644, 647-48 (6th Cir. 2013). The fact that this Court explicitly reviewed Plaintiffs' standing, and decided the case on its merits, precluded the district court from dismissing Plaintiffs' challenge the 2020 PSA under the same facts which existed for nearly five years of litigation.

**E. Under the District Court's Analysis, it is Entirely Unclear Who Would Have Standing to Challenge the PSA.**

If the district court's holding were correct – that merely being required to submit to a background check does not constitute an Article III injury conferring standing – then it is difficult to see who *would* have standing to challenge the 2020

PSA.  Apparently sensitive to its dismissal of Roberts' claims – the quintessential gun owner suffering quintessential injuries under the 2020 PSA – the district court theorized that "some entities could presumably bring actions to challenge ATF's PSA."  Page ID#1415.  Specifically, the court speculated that "FFLs *might* have Article III standing," such as "the FFL Roberts visited," which "lost a sale and may continue to lose sales...."  *Id.* (emphasis original).  But ultimately, the district court explained, even if "an agency's action might go unchallenged," a court "cannot exceed its constitutional authority...."  *Id.*

Yet as the district court noted, any FFL bringing suit "would still need to establish the second and third elements of Article III standing" – namely, traceability and redressability.  *Id.* at n.11.  Indeed, the district court's hypothetical likely suffers from a traceability challenge.  If, as the district court believed, Roberts simply could have complied with the 2020 PSA, and "completed [a] Form 4473, [] promptly passed the NICS check[,] and left the FFL with a new firearm the same day" – all without being harmed – then it would seem that the choice to leave the store emptyhanded is traceable to Roberts's voluntary decision, not ATF and its 2020 PSA.  Nor does it follow how an FFL – representing one side of a commercial transaction – "*might*" be harmed, but the would-be gun buyer – the other side of the commercial transaction – would suffer no harm.

By seeking to focus attention away from the obvious harm to Roberts, the

district court minimized that every gun owner with a qualifying Michigan permit now must submit to additional ATF demands from which federal law specifically exempts them. If Roberts and GOA cannot challenge the 2020 PSA on that basis, then it seems unlikely that anyone could.[16] To deny Plaintiffs' standing would mean that ATF could wholesale repeal Section 922(t)(3) by issuing letters revoking eligibility *of all permits in every state* — and, under the district court's ruling, would be completely insulated from judicial review, because the only resulting harm would be an unlawful background check.

### F. Plaintiffs' Harm Is Traceable to Defendants and Redressable by This Court.

Satisfying itself with the purported lack of harm to Plaintiffs, the district court did not address the remaining standing prongs of traceability and redressability. And Defendants, for their part, have not disputed that a court could redress Plaintiffs' injury – as vacating the 2020 PSA and enjoining its enforcement would return Michigan to the status quo as it existed for years prior to March of 2020, where Plaintiffs would again be permitted to use their CPLs to purchase firearms in lieu of NICS checks.

The government did, however, contest traceability in *Lee*, on the strained

---

[16] It is also unlikely that a State could challenge the ATF 2020 PSA on behalf of its citizens, since "'a State does not have standing as *parens patriae* to bring an action against the Federal Government.'" *Wyoming ex rel. Sullivan v. Lujan*, 969 F.2d 877, 883 (10th Cir. 1992).

theory that the *Lee* plaintiff's injury was not "traceable to any action by ATF" because "acceptance of a valid alternate permit is entirely discretionary on the part of an FFL" and it is plausible a FFL "would [] exercise[] its independent judgment to run a NICS background check even absent the 2019 PSA." *Lee v. DOJ*, Defendants' Opposition to Plaintiffs' Motion for Summary Judgment ("Lee Opp.") #26 at 15-16.[17] Defendants do not repeat that argument here. And for good reason, because that claim is like theorizing that an FFL might decide to close for the night the moment Roberts entered the store to use his CPL to purchase a firearm, and thus his inability to acquire a firearm would not be traceable to the 2020 PSA. But that is not how traceability works. *See, e.g.*, *Grow Mich., LLC v. LT Lender, LLC*, 50 F.4th 587, 592 (6th Cir. 2022) ("[A]n injury is traceable where the defendant's actions impair a third party's ability to [do something for] the plaintiff."); *Binno v. ABA*, 826 F.3d 338, 352 (6th Cir. 2016) ("[C]onstitutional standing requires only that an injury be 'fairly traceable,' not 'solely traceable,' to the defendant's challenged action.").

Unsurprisingly, the *Lee* court rejected Defendants' traceability argument, concluding that, "[o]n standing, the Court is satisfied that the PSA rescinded the §922(t)(3) exemption … and requires [Lee] to submit to an [sic] NICS background

---

[17] Roberts' declaration reads quite differently, explaining that the FFL's refusal to sell him a firearm using his CPL was made "consistent with the" (*i.e.*, but for) 2020 PSA. R.1-1, Page ID#23.

check." 554 F. Supp. 3d at 1234. Likewise, here, Plaintiff Roberts, along with GOA's other Michigan members, in the past have been able to use CPLs in lieu of a NICS check (as Congress intended) but, now, as a direct "but-for" consequence of ATF's Michigan PSA, no longer are able to do so. That injury to Plaintiffs is the direct and "traceable" consequence of the challenged ATF action.

Finally, to the extent that Defendants previously have claimed that Roberts *injured himself* by declining to purchase a firearm under ATF's new scheme (Second XMSJ, R.63, Page ID##1289-1290), the *Lee* district court rejected that argument as well. 554 F. Supp. 3d at 1235. The Second Circuit recently rejected a similar argument. *See Antonyuk v. James*, 2024 U.S. App. LEXIS 26958, at *62 (2d Cir. Oct. 24, 2024) (even if the plaintiff's "injury stems from his own unwillingness to comply with the challenged requirements[,] so long as the interest at stake is cognizable (as [the] interest in carrying a firearm surely is), a plaintiff suffers an injury-in-fact if the defendant's allegedly unlawful conduct impairs that interest, even if it does so by deterring the plaintiff due to his individual, but reasonable, sensibilities.").

## II. THE 2020 PSA IS UNLAWFUL AND MUST BE VACATED.

### A. The 2020 PSA Was Promulgated Without Any Evidence that "the Law of the State" Had Changed.

#### 1. Defendants Needed to Make an Additional Showing on Remand.

Throughout this litigation, Plaintiffs have maintained that Section 922(t)(3)'s

phrase "the law of the State" requires a court to look no further than the text of the relevant state statute. *See, e.g.*, Brief for Appellants, No. 21-1131 R.15, Page #14. However, this Court ultimately concluded that reliance *only* on the text "is a bridge too far."[18] Per Curiam Opinion at 6. Nevertheless, this Court noted that "a complying state statute … usually will suffice by itself," and in this case "Michigan seems to do what the federal law requires," and "[h]istory suggests a similar conclusion." *Id.*

In remanding this case to the trial court for further proceedings, this Court left open the possibility that there might exist an authoritative interpretation of state law which could justify ATF's 2020 PSA, such as "a state-court decision that dilutes the apparent meaning of the statute, or perhaps an opinion by the Michigan Attorney General that casts light on the statute." *Id.* at 6-7. Thus, this Court offered Defendants the opportunity, on remand, to supplement the record with some sort of authoritative evidence rebutting the presumption that the 2020 PSA was arbitrary and capricious – based on nothing more than Defendants' conjecture. In other words, on remand, Defendants began at a marked deficit, needing to show something more to prevail.

### 2. Defendants Failed to Provide Further Justification for the 2020 PSA.

---

[18] While continuing to believe that analysis under Section 922(t)(3) should begin and end with the plain text of a state statute, Plaintiffs acknowledge that this Court's prior opinion rejected that argument, and so Plaintiffs do not repeat it here.

As this Court previously explained, the 2020 PSA could not be justified based on the previously-submitted administrative record. Per Curiam Opinion at 9 ("All [ATF] has are ostensible statements by unidentified individuals … who spoke to unidentified people … along with an unexamined audit that by itself does not show how state law works [or] what the Brady Act requires."). Indeed, Defendants argued below that Michigan had experienced "a change in state law *promulgated by 'legal counsel.'*" First XMSJ, R.21, Page ID#470 (emphasis added); *see also id.* at Page ID#460 n.2 ("possibly in consultation with the Michigan AG"); 2020 Order, R.25, Page ID#555 ("albeit, with rather vague reasoning"). Not only was that new guidance informal, provided by "MSP legal counsel" (Page ID#554), but also it was temporary, since MSP was "awaiting further guidance" and "waiting on an opinion from the new AG as to whether the new AG agrees with the process" (Page ID##555, 554). MSP's changed direction was also in conflict with the opinions of two prior Michigan Attorneys General on the subject. Agency Record, R.16-1, Page ID##110, 143.

Unsurprisingly, this Court rejected the notion that low-level, unnamed "state officials" can unilaterally alter the meaning of state law,[19] but allowed that there

---

[19] Were it otherwise, then the Michigan legislature would be powerless to override MSP's bureaucratic annulment of state law and obtain Section 922(t)(3) eligibility for CPLs. *See Bldg. Serv. Emps. Int'l Union v. Gazzam*, 339 U.S. 532, 537-38 (1950) ("The public policy of any state is to be found in its constitution, acts

might be "a state-court decision … or perhaps an opinion by the Michigan Attorney General that casts light on the statute."  Per Curiam Opinion at 6-7.  Thus, it was ATF's burden on remand to identify an *authoritative* source on which to justify the 2020 PSA.[20]  On remand, the district court offered ATF not one – but two – opportunities to supplement the record and thereby demonstrate what the position of the Michigan AG was *when* ATF adopted the 2020 PSA.  May 27, 2022 Order, R.39, Page ID#646; Sept. 27, 2023 Order, R.55, Page ID#1171.  But although providing additional interpretations they claim further support *their initial inferences*,[21]

---

of the legislature, and decisions of its courts.  'Primarily it is for the lawmakers to determine the public policy of the State.'")  Indeed, when the Michigan legislature amended MCL § 28.426(2) in 2005, it did so expressly "to align the state statute with federal law."  Mich. H. Fiscal Agency B. Analysis, H.B. 4977 (Sept. 13, 2005).  Thus, "MSP legal counsel" cannot undo that by "informal" guidance.  *See Am. Fid. Bank & Tr. Co. v. Heimann*, 683 F.2d 999, 1005 (6th Cir. 1982) (an "interpretation may be upheld on the basis of the language of the statute," and "the fact that a state agency or state administrator reads it differently is not controlling."); *Ferguson v. Gonyaw*, 64 Mich. App. 685, 694 (1975) ("the law of the State of Michigan … is changed by the Supreme Court or the Legislature.").

[20] Neither the parties nor the district court has identified any Michigan court decision interpreting MCL § 28.426(2).

[21] Defendants initially supplemented the administrative record with two additional declarations, along with Michigan's amicus brief.  R.46.  The district court subsequently struck the amicus brief from the administrative record, because it "does not address [the Michigan AG's] position … *at the time of the challenged agency* action" and thus "'could not possibly have been considered or relied on by the agency when it issued the 2020'" PSA.  Sept. 27, 2023 Order, R.55, Page ID#1165; see also *id.* at Page ID#1164 (amicus "did not state what the Michigan Attorney General's position was during the relevant … time period").  And after the district court provided a further opportunity, Defendants added two further declarations and two pages of handwritten notes.  R.58, R.58-1, R.58-3.

Defendants offered no concrete evidence that the Michigan AG ever took a position either way.[22]

Indeed, after Defendants' first round of record supplementation on remand, the district court noted that "[t]he exact reason for th[e] change" in MSP policy "remains unclear." Sept. 27, 2023 Order, R.55, Page ID#1157; *see also id.* at Page ID#1170 ("the record is not clear"), Page ID#1169 (noting "lingering questions"). And after Defendants' second record supplementation, even they were forced to admit that "ATF never received a communication from … anyone … that the Michigan AG had rendered a formal opinion...." Second Declaration of Eric M. Epstein, R.58-1, Page ID#1209, ¶29; Declaration of Brian Allen Barker, R.58-3, Page ID#1214, ¶14 (same for FBI), Page ID#1211, ¶4 ("I am not aware of any direct communications between the FBI and the Michigan Attorney General's office....").

---

[22] Even if Defendants had been able to produce a formal opinion issued by the Michigan AG circa 2020, such opinion would "not have the force of law" about the meaning of Michigan law. *See Beer & Wine Ass'n v. Att'y Gen.*, 142 Mich. App. 294, 300 (1985); *Michigan ex rel. Oakland Cnty. Prosecutor v. Dep't of Corr.*, 199 Mich. App. 681, 691 (1993) (while the "opinion of the Attorney General is binding on state agencies and officers, such opinions do not have the force of law and are not binding on courts."). Rather, "the law of the state" of Michigan is "found in its Constitution, the statutes, or the judicial records." *N.Y. Life Ins. Co. v. Hamburger*, 174 Mich. 254, 258 (1913) ; *see also State Farm Fire & Cas. Co. v. Liberty Ins. Underwriters, Inc.*, 613 F. Supp. 2d 945, 950-51 (W.D. Mich. 2009) ("In applying state law, we anticipate how the relevant state's highest court would rule in the case...."); *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938) ("whether the law of the State shall be declared by its Legislature in a statute or by its highest court in a decision is not a matter of federal concern.").

In other words, Defendants have come up short, offering nothing but conjecture on remand. Yet under the APA's "arbitrary and capricious" review, an "agency is required to 'examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Chamber of Com. of U.S. v. SEC*, 115 F.4th 740, 750 (6th Cir. 2024) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Despite multiple chances to rationalize their 2020 PSA, Defendants have offered no such explanation, and so their 2020 PSA is arbitrary and capricious. *See* II(C), *infra*.

### 3. Michigan's Amicus Brief Cannot Justify the 2020 PSA.

As noted, the State of Michigan filed an amicus brief in the district court on September 30, 2022. *See* R.45. In it, the State opined that MCL § 28.426 "does not contemplate, let alone require, that MSP conduct additional inquires beyond … the information contained in LEIN and NICS." *Id.* at Page ID#721. As Michigan described, conducting "additional research" and making "independent[] determin[ations] … exercising independent discretion" is often a complex process involving voluminous "external information" and requires referencing "local criminal ordinances or codes," all of which would require the state to "marshal" significant "resources." *Id.* at Page ID#725-726 (citing this Court's discussion of "difficult matching problems").

Notably, the Michigan amicus brief "did not state what the Michigan Attorney General's position was during the relevant January 2019 to March 2020 time period." Sept. 27, 2023 Order, R.55, Page ID#1163. Additionally, the Michigan amicus brief does not inform whether there were any communications between the Michigan AG and Defendants during that time period. For those reasons, the 2022 Michigan amicus brief provides no independent justification for ATF's 2020 actions. Indeed, the district court found as much, striking the amicus brief from the administrative record after Defendants included it as purported record supplementation. *See id.* at Page ID#1165 (amicus brief "does not address her position … *at the time of the challenged agency action*").

Because "the administrative record in this case [is] limited to the facts that the ATF considered at the time of its decision" (July 29, 2022 Order, R.42, Page ID#693), Michigan's 2022 amicus brief is not part of that record.[23]  Indeed, the APA requires reasoned decisionmaking at the time the agency's determinations were made. *See Poole v. Harvey*, 571 F. Supp. 2d 120, 126 (D.C. Cir. 2008) ("It is a 'fundamental rule of administrative law' that a court reviewing an agency's decision 'must judge the propriety of [agency] action solely by the grounds invoked by the

---

[23] Generally, "courts confine their review to the administrative record, which includes all materials compiled by the agency[] that were before the agency at the time the decision was made." *Sierra Club v. Slater*, 120 F.3d 623, 638 (6th Cir. 1997) (cleaned up, citations omitted).

agency.'"). In contrast, "[n]ew arguments and analysis … presented for the first time in litigation in an effort to prop up the agency's decision, are not part of what the court reviews under the [APA]." *Messina v. U.S. Citizenship & Immigr. Servs.*, 2006 U.S. Dist. LEXIS 10292, at *8 n.3 (E.D. Mich. Feb. 16, 2006).

### B. Section 922(t)(3) Does Not Require an Ends-of-the-Earth Pursuit of Any Disqualifying Record or Erroneously Issued Permit.

#### 1. As This Court Previously Determined, Michigan Need Not Ferret Out Every Possible Disqualifying Conviction.

For many years, ATF took the position that Section 922(t)(3)'s mandate that state law require state officials to "verify the information available" equated to a review of the information "in NICS." *See* 63 Fed. Reg. 8381 (Feb. 19, 1998) ("'the information available to' State officials will include the NICS database."); Agency Record, R.16-2, Page ID#253 ("information 'available' to State permit officials … will include the information provided by NICS...."). But as evidenced by the 2020 PSA, ATF no longer maintains that position. Now, ATF claims that "a state must 'review the NICS information' … *and other 'information* available'...." First XMSJ, R.21, Page ID#465 (emphasis added); *see also id.* at Page ID#459 (emphasis added) ("take the information returned by a NICS search *and conduct the additional research* or analysis needed....").

Understandably, Michigan disagrees with ATF's new analysis, explaining that there is no "federal law requiring a state agency … to make a final determination of

factual and legal issues in applying federal law." Agency Record, R.16-1, Page ID#97. Rather, state "authority only extends to querying the NICS for existing prohibitions, not to make [sic] new prohibitions determinations [sic] based on information discovered during research." *Id.* at Page ID#96. Indeed, nothing in Section 922(t)(3) even arguably requires a state to further *investigate* potentially prohibiting records that NICS returns, much less *seek out and gather* new information from state and local records across the country, then *analyze* those records, *make* complex legal determinations, and finally *enter* those new disqualifications into NICS to be used in the future. *See id.* at Page ID#105 (requiring Michigan to pursue "information discovered during research" to "adjudicat[e]" any potential disqualifying information, and to "make new prohibition determinations.").

And for good reason, as investigating and applying the federal MCDV prohibitor is a uniquely difficult task. Michigan explains the problems, including "non-uniform or incomplete reporting," "the possibility that many misdemeanor offenses include disjunctive elements that may (but do not necessarily) constitute disqualifying conduct," the "interpretation of quite old case records that were very likely not created in contemplation" of MCDV, and "applying the 'civil rights restored' MCDV exception" which "can in some cases present considerable questions of law and fact." *Id.* at Page ID#104. As the Supreme Court concluded in

*United States v. Hayes*, 555 U.S. 415, 426 (2009), a predicate MCDV relationship "need not be denominated an element of the predicate offense." Rather, in order to determine whether a potentially disqualifying record is actually prohibiting, an investigator often must contact state or local governments or courts in order to seek out highly detailed charging information, arrest records, or other information, in order to determine the existence of a predicate MCDV relationship. None of this information is "NICS information" or contained "in NICS"; rather, it exists entirely outside the NICS system, which is why NICS was unable to give a definitive result in the first place. *See* Amicus Brief, R.45, Page ID#725 ("[W]hile a … NICS check might indicate a conviction of 'assault' … a determination as to whether the offending conduct involved … [MCDV] … cannot necessarily be made solely on the basis of information contained in the criminal-information systems. … [but] would necessitate … exercising independent discretion in determining that the offending conduct meets the criteria for a federal debarment."); *see also* Per Curiam Opinion at 7 (noting these "difficult matching problems").

Unlike Michigan, the federal government performs inquiries and investigations for all NICS checks from non-Point of Contact states.[24] For instance,

---

[24] In order to facilitate Defendants in making these determinations, Michigan kept records on the 50 permits issued to those with outstanding questions, so that it later could "go and revoke the permits" if either ATF or the FBI ever reported that the permittee is disqualified. Agency Record, R.16-1, Page ID#140. *See also id.* at Page ID#108 (Michigan requesting to "collaborate with NICS" to help FBI make

in October 2024, the FBI completed 2,374,172 NICS checks.[25]  Given the vast number of background checks the federal government performs, it is much better-positioned to apply *federal law* to determine if a person is *federally prohibited* from possessing a firearm.  The FBI and ATF have the infrastructure and personnel, along with the technical and legal experience, to make determinations about prohibited records.  Indeed, the FBI is tasked by law with maintaining the NICS system and the integrity of the records therein.[26]  *See* 28 C.F.R. § 25.5.  Michigan has no such obligation.  Thus, as this Court previously concluded, "[w]e cannot take one phrase ('verify the information available') and give it a different, and far more burdensome, meaning ('verify that the circumstances of the underlying offense do not violate federal law').  No such directive appears in the statute."  *Id*. at 7, 8.

### 2.  ATF's "Corrective Measures" Have No Legal Basis.

ATF's statutory revisionism did not end with its demand that Michigan authorities look outside NICS and then supplement federal databases with their own independent findings and legal conclusions.  Along with the 2020 PSA, ATF

---

determinations, and offering to "gather relevant records … and refer that information to NICS...."). In other words, if Defendants had ever bothered to determine if these individuals were prohibited, then all they had to do was say so.

[25] *See* https://www.fbi.gov/file-repository/nics_firearm_checks_-_day_month_year.pdf/view.

[26] The FBI also handles appeals of NICS denials. *See* https://www.fbi.gov/how-we-can-help-you/more-fbi-services-and-information/nics/national-instant-criminal-background-check-system-nics-appeals-vaf.

provided the Michigan AG with a list of four "corrective measures" to be implemented, should the State "desire[] to have its CPLs again qualify as an alternative to NICS...." Agency Record, R.16-1, Page ID#192. As Plaintiffs explained below, none of these "corrective measures" comports with Section 922(t)(3), and their promulgation only further evinces the rampant atextualism plaguing Defendants' position. *See* Combined Reply, R.23, Page ID##517-520; 2020 Order, R.25, Page ID#569 (district court upholding the "corrective measures" not under the statute, but rather because they "would seem well within BATF's discretion"); Brief for Appellants, No. 21-1131 R.15, Page #34.

First, ATF demanded a "full NICS check … on all individuals previously issued CPLs without a full NICS check...." Agency Record, R.16-1, Page ID#192. But nothing in Section 922(t)(3) authorizes ATF to demand correction of past problems with *previously issued* CPLs. Indeed, when ATF first recognized the CPL as a Brady Alternate in 2006, it required no such retroactive scrutiny. *See* Complaint Exhibit A, R.1-4, Page ID#30. Second, ATF demanded that "[a]ll CPLs previously issued to [prohibited] individuals … *must be revoked*, … *and recovered*...." *Id.* (emphasis added). But once again, the statute does not require *revocation and seizure* of state permits as a precondition for Section 922(t)(3) exemption. *See Willis v. Winters*, 253 P.3d 1058, 1066 (Or. 2011) ("Congress has not enacted a law requiring license denial as a means of enforcing [federal] policy...."); *Printz v. United*

*States*, 521 U.S. 898, 935 (1997) ("[t]he Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' …to administer or enforce a federal regulatory program."). And third, ATF demanded that, for prohibited persons determined to be "in possession of a firearm … those cases *should immediately be referred to the local ATF field office*" for prosecution. Agency Record, R.16-1, Page ID#192 (emphasis added). Of course, this last requirement most clearly violates the anti-commandeering principles explained in *Printz*.

At bottom, ATF has dreamt up and imposed a host of entirely novel requirements for Michigan that in no way are an interpretation of Section 922(t)(3), but rather a blatant expansion of it. In fact, ATF previously admitted it could not add such requirements to the statute, including revoking previously issued permits. Agency Record, R.16-2, Page ID#260 n.2 (While "[t]here may be rational policy reasons" to add requirements to the statute, "'rationality is not enough. [ATF] need[s] authority.'"). This prior view comported with the statute. ATF's current position does not.

## C. The 2020 PSA Is Arbitrary and Capricious.

Below, Plaintiffs explained that the 2020 PSA was, from the start, a solution in search of a problem. Indeed, the genesis of ATF's PSA was a small number (50) of CPL applications that were "pushed" to county clerks after the State could not

conclusively determine the applicants' eligibility. Agency Record, R.16-1, Page ID#115. This, in a state where many hundreds of thousands of people hold CPLs.[27] Of course, Congress struck the balance it did with Section 922(t)(3) despite being well aware that it would be possible to acquire a disqualifying record *after* obtaining a Brady Alternate permit. *See* Per Curiam Opinion at 8 ("a real-time, perfect match … was never part of the design"); Agency Record, R.16-2, Page ID#262 (ATF previously admitting that Section 922(t)(3) "may result in the purchase of firearms by individuals with Federal firearms disabilities," an "inevitable result of the law" and "not something that ATF can address through the regulations").

But although eager to revoke Michigan's CPL as a Brady Alternate, Defendants seemed entirely uninterested in determining whether prohibited persons had *actually* acquired permits or firearms, blithely noting that "we do not have the end results." Agency Record, R.16-1, Page ID#140. Indeed, even after both an FBI audit in 2019,[28] and an unlawful ATF "sampling … re-check" initiative the same year,[29] Defendants amassed a grand total of *zero* evidence that *any* prohibited person had *ever* used a Michigan CPL to obtain a firearm. *See id.* at Page ID#150 (ATF "did not identify a [single] prohibited CPL holder using a CPL to circumvent a NICS

---

[27] *See* Michigan State Police CPL Applications by County, https://tinyurl.com/4txfzh5u.
[28] *Id.* at Page ID##149-150.
[29] *Id.* at Page ID#149.

check and obtain a firearm....").

Based on the harshness of the 2020 PSA's revocation of hundreds of thousands of Michigan CPLs as Brady Alternates – initiated without evidence of any problem at all – one might conclude that Defendants take quite seriously even the remote possibility of potentially prohibited persons acquiring firearms. But one would be quite wrong. Showing the patent absurdity of the 2020 PSA is the FBI's own track record on clearing background checks when potentially disqualifying records are found. Indeed, every year the FBI fails to complete *hundreds of thousands* of background checks,[30] which should put Michigan's failure to complete *fifty* such checks in proper perspective.

An OIG report explains that, from 2003 to 2013, the FBI "purged … about 1.3 million records," representing background checks that were never completed.[31] A Roll Call Freedom of Information Act Request subsequently found the FBI had purged an additional 1.1 million background checks from 2014 to 2019.[32] Thereafter, NBC News reported that the FBI had purged an additional 0.7 million background checks in 2020 and 2021 alone.[33] And in 2022 (the last year data is

---

[30] Federal law permits an FFL to transfer a firearm after three business days without a definitive answer from the FBI. *See* 18 U.S.C. § 922(t)(1)(B)(ii). And the FBI must destroy the associated records within 90 days. *See* 28 C.F.R. § 25.9(b)(1)(ii)

[31] http://tinyurl.com/ms85be3j, at 12.

[32] http://tinyurl.com/mwanswrt.

[33] http://tinyurl.com/227cfrrb.

available), the FBI failed to complete another 0.3 million NICS checks.[34]  Adding these numbers together results in a sum total of about *3.4 million* firearms that the FBI has allowed to fall into the hands of potentially prohibited persons, based on its failure to complete the very checks that it demands Michigan complete here.

Hypocritically, Defendants claim that "completed" background checks are a "crucial part" of a "'comprehensive scheme' designed to 'keep guns out of the hands of criminals and others who should not have them'...."  Second XMSJ, R.63, Page ID#1274.  But if that were really the case, why would Defendants fail to complete *millions* of these checks?  Defendants claim that they were all but forced to issue the 2020 PSA, because of "the public safety risk of issuing Michigan CPLs to potentially prohibited persons...."  *Id.* at Page ID#1284.  But while projecting their own failures, Defendants fail to explain how "public safety" is harmed when Michigan fails to complete fifty background checks, and not when the FBI fails to complete almost that many *every hour of every day*.[35]

Defendants' position that Michigan must "'disqualify <u>all</u> individuals prohibited under Federal law'" or else its "'permits … would not be accepted as alternatives'" (*id.* at Page ID#1278, emphasis added) is both hypocritical and in

---

[34] https://www.fbi.gov/file-repository/nics-2022-operations-report.pdf/view.
[35] *See* Matthew 7:3-5 KJV ("Thou hypocrite, first cast out the beam out of thine own eye; and then shalt thou see clearly to cast out the mote out of thy brother's eye.").

conflict with the statute.  Indeed, this Court already found as much, noting that the Section 922(t)(3) process, just like an ordinary NICS check, may have "shortcoming[s]."  Per Curiam Opinion at 8.  Rather, the Court explained, "[q]ualifying States under the Act must establish a reliable proxy, not a perfect analog."  *Id.* at 9 (emphasis added).  For Defendants' part, though, they act as if this Court's opinion was never issued.  Even on remand, Defendants continued to parrot their argument that, "if the 'State did not disqualify *all* individuals under federal law,' 'the permits issued by that State would not be accepted as alternatives....'"  Second XMSJ, R.63, Page ID#1278 (emphasis added).  But again, this Court expressly rejected this position, finding that "a real-time, perfect match … was never part of the design. … [C]ontrary to the ATF's argument … the mere presence of erroneous permit grants in the past [does not] establish authority by itself to remove a State from the eligibility list."  Per Curiam Opinion at 8.

Under the APA, "reasoned decisionmaking" requires an agency to treat similar things similarly.  *See Kreis v. Sec'y of the Air Force*, 406 F.3d 684 (D.C. Cir. 2005) ("It is axiomatic that 'an agency must treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so.'") (citation omitted); *Chamber of Commerce of United States v. SEC*, 670 F. Supp. 3d 537, 562 (M.D. Tenn. 2023).  In violation of this principle, ATF promulgated the 2020 PSA while apparently unaware (or blissfully ignorant of) the federal government's own colossal

shortcomings in conducting NICS checks.  Almost as important as what an agency did consider in reaching its decision is important are factors that the agency failed to consider.  *See Taylor v. Principi*, 92 F. App'x 274, 276-77 (6th Cir. 2004) (agency action arbitrary and capricious when agency "entirely failed to consider an important aspect of the problem").  If three million incomplete background checks does not constitute "an important aspect of the [public safety] problem" Defendants have identified, it is hard to see what would.

## CONCLUSION

Although spending three years on remand, Plaintiffs are no closer to vindicating their statutory right to purchase a firearm from an FFL utilizing their Michigan CPLs.  During that time, the district court gave Defendants numerous opportunities to justify their actions, yet Defendants failed to capitalize.  Meanwhile, the district court rejected Plaintiffs' repeated requests to get to the bottom of this Court's "several follow-up questions."  Instead, and despite this Court previously having addressed Plaintiffs' standing, with one judge opining that Defendants' arguments were "bonkers," "astonishing," and "silly," the district court adopted those arguments verbatim, and dismissed Plaintiffs' complaint *without addressing any of the issues that formed the basis of this Court's remand*.  To the extent that the basis for the 2020 PSA remains unclear, that is not Plaintiffs' doing.  But what is clear is that ATF never had any legitimate basis for its 2020 actions, instead basing

its decision on speculation and conjecture. And as for ATF's legal position, it continues to demand Michigan perform the sort of ends-of-the-earth inquiries that this Court explained the statute does not require. This Court should reverse the trial court's decision, declare ATF's actions unlawful, and vacate the 2020 PSA without further remand.

Respectfully submitted,

/s/ Stephen D. Stamboulieh

Robert J. Olson
WILLIAM J. OLSON, P.C.
370 Maple Avenue West, Ste. 4
Vienna, VA 22180
T: (703) 356-5070
rob@wjopc.com

Kerry Lee Morgan
PENTIUK, COUVREUR & KOBILJAK, P.C.
2915 Biddle Avenue, Suite 200
Wyandotte, MI 48192
T: (734) 281-7100
kmorgan@pck-law.com
Counsel for Appellants

Stephen D. Stamboulieh
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS 38654
T: (601) 852-3440
stephen@sdslaw.us

# CERTIFICATE OF COMPLIANCE

IT IS HEREBY CERTIFIED:

1. That the foregoing Brief for Appellants complies with Fed. R. App. P. 32(a)(7)(B) as it includes 12,980 words, excluding the parts of the brief exempted by Rule 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office 365 in 14-point Times New Roman.

*/s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh

## CERTIFICATE OF SERVICE

I hereby certify that on December 11, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh

**ADDENDUM**

**DESIGNATION OF RELEVANT LOWER COURT DOCUMENTS**

| Record Entry | Document | Page ID# |
|---|---|---|
| R.1 | Complaint | 1-21 |
| R.1-1 | Declaration of Roberts | 22-25 |
| R.1-4 | ATF Open Letter | 29-31 |
| R.16 | Administrative Record | 83-87 |
| R.16-1 | Agency Record | 88-192 |
| R.16-2 | Agency Record | 193-264 |
| R.17 | Plaintiffs' First Motion for Summary Judgment | 403-439 |
| R.21 | Defendants' First Cross-Motion for Summary Judgment | 444-479 |
| R.23 | Combined Reply Brief | 512-535 |
| R.25 | 2020 Order | 546-571 |
| R.34 | February 15, 2022 Order | 592-593 |
| R.39 | May 27, 2022 Order | 636-647 |
| R.40 | Plaintiffs' Motion for Reconsideration | 648-659 |
| R.42 | July 29, 2022 Order | 691-698 |
| R.45 | Michigan Attorney General Amicus | 704-727 |
| R.46 | Supplemented Administrative Record | 728-733 |
| R.47 | Plaintiffs' Motion to Strike, Permit Limited Discovery, and For Leave to Supplement | 1088-1109 |

| R.55 | September 27, 2023 Order | 1155-1172 |
|------|--------------------------|-----------|
| R.58 | Corrected Filing of Agency Declarations | 1195-1196 |
| R.58-1 | Second Declaration of Eric Epstein | 1197-1207 |
| R.58-2 | Handwritten Notes | 1208-1209 |
| R.58-3 | Declaration of Brian Barker | 1210-1215 |
| R.60 | Plaintiffs' Second Motion for Summary Judgment | 1224-1259 |
| R.63 | Defendants' Cross-Motion for Summary Judgment | 1264-1303 |
| R.64 | Defendants' Opposition to Plaintiffs' Motion for Summary Judgment | 1304-1333 |
| R.66 | Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment | 1351-1368 |
| R.67 | Plaintiffs' Response to Defendants' Opposition | 1369-1382 |
| R.69 | DOJ Reply Brief | 1385-1398 |
| R.70 | Order | 1399-1418 |
| R.71 | Judgment | 1419 |
| R.72 | Notice of Appeal | 1420 |