RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0296p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

GUN OWNERS OF AMERICA, INC.; DONALD J. ROBERTS, II,

           *Plaintiffs-Appellants*,

    *v.*

U.S. DEPARTMENT OF JUSTICE; BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; DANIEL DRISCOLL,

           *Defendants-Appellees*.

> No. 24-1881

─────────────

Appeal from the United States District Court for the Eastern District of Michigan at Bay City.
No. 1:20-cv-10639—Thomas L. Ludington, District Judge.

Argued: October 27, 2025

Decided and Filed: October 30, 2025

Before: SUTTON, Chief Judge; BATCHELDER and LARSEN, Circuit Judges.

─────────────

### COUNSEL

**ARGUED:** Robert J. Olson, WILLIAM J. OLSON, P.C., Vienna, Virginia, for Appellants. Sean R. Janda, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** Robert J. Olson, WILLIAM J. OLSON, P.C., Vienna, Virginia, Kerry Lee Morgan, PENTIUK, COUVREUR & KOBILJAK, P.C., Wyandotte, Michigan, Stephen D. Stamboulieh, STAMBOULIEH LAW, PLLC, Olive Branch, Mississippi, for Appellants. Sean R. Janda, Michael S. Raab, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.

———————————

**OPINION**

———————————

SUTTON, Chief Judge.  Donald Roberts and Gun Owners of America sued the Bureau of Alcohol, Tobacco, Firearms and Explosives.  They aimed to prohibit the Bureau from enforcing a public-safety advisory that instructed gun sellers to reject a Michigan firearms license as a satisfactory alternative to a federally required background check.  But the dispute has become stale.  The Bureau has withdrawn the advisory.  It thus no longer stands in the way if Roberts wishes to use his Michigan license to purchase a gun.  Because this case does not present a live controversy warranting federal judicial intervention, we vacate the judgment of the district court and remand the case with instructions to dismiss as moot.

I.

The Brady Handgun Violence Prevention Act requires gun buyers to pass a background check before purchasing a weapon.  *See* Pub. L. No. 103-159, 107 Stat. 1536.  To ensure that felons and others barred by law from owning guns do not acquire them, the Act created the National Instant Criminal Background Check System (NICS) as a database for gun merchants to check before selling a firearm to a customer.  34 U.S.C. § 40901(b).  The system flags whether a gun purchase would violate state or federal law.  *See id.*  If it would violate either set of laws, the seller may not complete the sale.  18 U.S.C. § 922(t)(1).

The Act contains an exception from the background-check requirement for buyers who hold approved state firearm permits.  *Id.* § 922(t)(3).  For a permit to qualify, "the law of the State" must provide that a government official may issue it only after determining that the available information "does not indicate that possession of a firearm by" that customer "would be in violation of law."  *Id.* § 922(t)(3)(A)(ii).  The U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives—better known as the ATF—informs federally licensed gun sellers whether state permits satisfy this exception.  *See* 28 C.F.R. § 0.130(a).

No. 24-1881 *Gun Owners of America, Inc., et al. v.* Page 3
*U.S. Dep't of Justice et al.*

Before 2020, the ATF treated Michigan's concealed-pistol licenses as qualifying under this provision. For a Michigander to receive such a license, "[t]he department of state police, or the county sheriff" must "determine[] through the federal national instant criminal background check system that the applicant [for the permit] is not prohibited under federal law from possessing or transporting a firearm." Mich. Comp. Laws § 28.426(2)(a).

But ATF officials grew concerned that Michigan inadequately investigated red flags raised in the federal background-check database before it issued permits. When the database suggested that a potential obstacle to a customer's purchase of a gun might exist, the Michigan State Police concluded that it need not research whether that circumstance did in fact legally bar the customer from buying a gun. After efforts to resolve the ATF's concerns with Michigan law enforcement fell short, the Bureau sent a public-safety advisory to gun sellers in 2020 explaining that Michigan concealed-pistol licenses would no longer allow purchasers to avoid a separate federal background check.

In 2020, after the advisory went into effect, Roberts visited a Michigan gun store to purchase a shotgun. The store turned him away when he presented his state pistol license as an alternative to a NICS background check. Joined by Gun Owners of America, he sued the ATF, an ATF official, and the U.S. Department of Justice. Roberts sought an injunction prohibiting the ATF from enforcing the 2020 advisory and a declaration that ATF exceeded its authority in issuing the advisory and, in the process, violated the Administrative Procedure Act. *See* 5 U.S.C. § 551 *et seq*.

After the district court sided with the ATF on the merits and granted summary judgment in its favor, we vacated its order and remanded the case for further consideration of the "available information" about the "requirements of state law." *See Gun Owners of Am., Inc. v. U.S. Dep't of Just.*, No. 21-1131, 2021 WL 5194078, at *5 (6th Cir. Nov. 9, 2021) (per curiam) (quotation omitted). On remand, the district court dismissed Roberts' complaint for lack of standing. *Gun Owners of Am., Inc. v. U.S. Dep't of Just.*, 751 F. Supp. 3d 840, 852 (E.D. Mich. 2024). Roberts and Gun Owners of America appealed.

After the district court's dismissal order, things changed.  In January 2025, President Donald Trump entered office for a second term.  The next month, President Trump signed an executive order directing the Attorney General to "examine all . . . actions of executive departments and agencies . . . to assess any ongoing infringements of the Second Amendment rights of our citizens."  Exec. Order No. 14,206, Protecting Second Amendment Rights, 90 Fed. Reg. 9503 (Feb. 7, 2025).

The ATF took heed.  On May 23, 2025, it circulated a new advisory to gun sellers about which state firearm licenses qualified as NICS background-check alternatives.  *See* Megan A. Bennett, Assistant Dir. of Enf't Programs and Servs., Bureau of Alcohol, Tobacco, Firearms and Explosives, Open Letter to All Federal Firearms Licensees (May 23, 2025), https://www.atf.gov/firearms/docs/open-letter/all-ffls-may-2025-open-letter-all-federal-firearm-licensees-brady-act-nics/download.  The advisory shared the results of its "review of the laws and regulations of all U.S. states and territories" to "determine whether relevant firearms-related permits" met the Brady Act's requirements.  *Id.* at 1.  It linked to a chart advising gun sellers about which gun permits qualified under the Act and showing "whether to accept state permits in compliance with Federal law."  *Id.*  The chart listed Michigan licenses as an acceptable Brady Act alternative.  *See id.*  The Bureau clarified that "this letter and the new chart . . . supersede[] all previous ATF open letters on NICS alternate permits."  *Id.* at 3.

## II.

### A.

As courts created under, and limited to the powers conferred in, the federal Constitution, we must always consider our power to act.  Whether at the beginning, in the middle, or at the end of a case, we must ensure we have jurisdiction over it.  That demand raises the possibility that a case could become moot due to intervening events.  *McPherson v. Mich. High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 458 (6th Cir. 1997).  Because the May 2025 ATF advisory rendered this case moot, we need not consider the district court's analysis of Roberts' standing.  *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007).

Article III gives the federal courts authority to hear only "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1.  This "cradle-to-grave requirement" limits the courts' power to live disputes.  *Fialka-Feldman v. Oakland Univ. Bd. of Trs.*, 639 F.3d 711, 713 (6th Cir. 2011). When events during the course of litigation, even while a case is on appeal, "make it impossible for the relevant federal court to grant any effectual relief," the court must dismiss the case as moot.  *Brown v. Yost*, 122 F.4th 597, 601 (6th Cir. 2024) (en banc) (per curiam) (quotation omitted).  The Constitution permits us to hear a case only when deciding it would have some "practical effect" on the parties.  *Ohio v. U.S. Env't Prot. Agency*, 969 F.3d 306, 308 (6th Cir. 2020).

A few exceptions to this general rule allow otherwise stale cases to stay alive.  The first is that a defendant's "voluntary cessation" of the activity challenged in the lawsuit does not end a case unless "there clearly is no reasonable expectation that the alleged violation will recur." *Resurrection Sch. v. Hertel*, 35 F.4th 524, 528 (6th Cir. 2022) (en banc) (quotation omitted).  In gauging whether this exception applies, "we presume that the same allegedly wrongful conduct by the government is unlikely to recur."  *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 767 (6th Cir. 2019).  That presumption does not apply equally to all government actions, however.  For regulatory changes, the weight of this "solicitude" depends on the process used to create the policy.  *Id.* at 768.  "If the discretion to effect the change lies with one agency or individual, or there are no formal processes required to effect the change," then "significantly more . . . is necessary to show that the voluntary cessation moots the claim."  *Id.*  Through it all, the mere "theoretical possibility of reversion to an allegedly unconstitutional policy is simply not sufficient to warrant an exception to mootness."  *Thomas v. City of Memphis*, 996 F.3d 318, 328 (6th Cir. 2021).

A second exception exists for actions that are capable of repetition yet evading review. *Resurrection Sch.*, 35 F.4th at 530.  This carve-out applies when the defendant's action has a short period of relevance—the kind of brief duration that prohibits the case from being fully litigated before the controversy runs its course and that creates "a reasonable expectation that the same complaining party will be subject to the same action again."  *Thompson v. DeWine*, 7 F.4th 521, 525 (6th Cir. 2021) (per curiam) (quotation omitted).

Measured by these requirements, this case is moot.  What was once a controversy no longer is.  Roberts complains that the 2020 ATF public-safety advisory caused a gun shop to reject his Michigan concealed-pistol license when he tried to buy a gun.  The ATF, however, has withdrawn the 2020 advisory.  And the agency has disavowed any attempt to enforce it.

Neither the superseded 2020 advisory nor the outcome of this lawsuit has the potential to affect Roberts.  He sought only forward-looking relief—a declaratory judgment and injunction—not money damages to compensate him for past injuries.  We thus cannot give him "any effectual relief."  *See Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (quotation omitted).  Because both the 2020 advisory and the policy it implemented are no longer live, his lawsuit is not either.

Neither of the mootness exceptions rescues this case.

*Voluntary cessation.*  Although the ATF voluntarily rescinded the challenged 2020 advisory, we think it is exceedingly unlikely that the agency will suddenly turn around and subject Roberts to the same alleged harm.  *See Speech First, Inc.*, 939 F.3d at 767.  *First*, nothing suggests that the ATF reversed course "in response to this lawsuit."  *Resurrection Sch.*, 35 F.4th at 529.  The superseding advisory came five years after Roberts filed this lawsuit.  *See Gun Owners of Am., Inc.*, 751 F. Supp. 3d at 840; ATF Open Letter at 1.  The new advisory, no less importantly, came just after the ATF had *won* on lack-of-standing grounds in the district court.  It seems especially unlikely that the government would retreat in fear of Roberts' complaint shortly after the district court dismissed the case for lack of standing.  Instead of creating the impression that it was engaged in a tactical change in position, moreover, the ATF cogently explained that its position resulted from a review of *all* state gun licenses required by President Trump to ensure compliance with the Brady Act and the Second Amendment.  *See* Exec. Order No. 14,206, 90 Fed. Reg. 9503.  All of this at least leaves the impression that the ATF no longer believed that the 2020 policy complied with the law.  In addition, the 2025 advisory covers several other states and territories, and no one claims that any of them are affected by this underlying litigation.  On this record, we see no basis for thinking the ATF will snap back to the old 2020 policy once freed from this litigation.

*Second*, Michigan's role in this dispute creates an extra, intervening variable that confirms the voluntary-cessation exception does not apply.  Mootness arises from the same Article III constraints on the "judicial Power" as standing.  *See* U.S. Const. art. III, § 2, cl. 1; *see also DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).  Just as a party ordinarily lacks standing when the sought-after remedy depends on the choices of third parties, *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992), so a case remains moot when non-parties' actions would be integral to a potential re-activation of the dispute.  *Cf. Moharam v. Transp. Sec. Admin.*, 134 F.4th 598, 609 (D.C. Cir. 2025) ("A legal controversy so sharply focused on a unique factual context does not present a reasonable expectation that the same complaining party would be subjected to the same actions again.") (quotation omitted).

An ATF turnabout—revocation of the May 2025 advisory and a return to the 2020 policy—would not suffice by itself to re-create this dispute.  Michigan also would have to stay silent about its law and its interpretation of that law.  Recall that this case centers on whether the ATF correctly interpreted "the law of the State" as not obliging Michigan officials to determine whether a gun-permit applicant may legally possess a firearm.  *See* 18 U.S.C. § 922(t)(3)(A)(ii).  Because States are masters of their own laws, *see Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975), Michigan remains free to repeal or amend its concealed-carry statute.  And the State's courts or attorney general may issue opinions clarifying the meaning of that law in ways that affect its status under the Brady Act.  *See Gun Owners of Am., Inc.*, 2021 WL 5194078, at *4–5.  The resuscitation of this controversy, as a result, depends on the actions not only of the ATF but also of Michigan.  Because Roberts neither sued the State nor alleged any harm caused by it, the State's unfettered choices in the future over these laws make it exceedingly unlikely that "the *same* allegedly wrongful conduct by the government" will recur.  *Speech First, Inc.*, 939 F.3d at 767 (emphasis added).

*Capable of repetition yet evading review*.  This exception to mootness does not apply either.  Even if the ATF reissued an advisory substantially similar to the 2020 one, the federal courts would be fully capable of providing effective relief.  Nothing stands in the way of courts resolving challenges like this one before they become moot.  *See Thompson*, 7 F.4th at 525.  Gun licenses do not have so short a duration as to create an "exceptional" scenario in which litigation

may not practically run its course before the controversy ends.  *See Spencer v. Kemna*, 523 U.S. 1, 17 (1998) (quotation omitted).  To the contrary, if the ATF reimposed the previous policy, Roberts or others similarly situated could sue and expect to have their day in court.

B.

Roberts tries to counter this conclusion in several ways.  He begins with the possibility that the ATF could rescind the May 2025 advisory and again refuse to recognize Michigan licenses.  But that ever-possible speculation does not breathe life into this lawsuit.  The ATF not only benefits from the customary presumption that the government will not return to voluntarily ceased conduct, but it also has offered sound explanations why a turnabout is unlikely.  The lawsuit is five years old.  The ATF just won on lack-of-standing grounds.  The change in position, which came in an advisory directly affecting several other states and territories, resulted from a Presidential order that applies to all state gun-licensing laws and seeks across-the-board compliance with the Brady Act and the Second Amendment.  And Michigan, at all events, could fix any future problems anyway by altering the relevant state laws or interpretations of them.

Our decision in *Speech First, Inc. v. Schlissel* does not alter this conclusion.  It held that a lawsuit against the University of Michigan based on disciplinary code provisions did not become moot when the University revised the provisions soon after the lawsuit was filed.  *Speech First, Inc.*, 939 F.3d at 761–62, 769–70.  Unlike in *Speech First*, the "timing" in this instance fails to "raise[] suspicions that [the ATF's] cessation is not genuine."  *Id.* at 769.  The timing of the ATF's change, to the contrary, strongly indicates that the 2025 updated advisory has nothing to do with this lawsuit.  The University, moreover, continued to defend the legality of the challenged policy provisions even after it rescinded them.  *Id.* at 770.  But the ATF "now believes that Michigan concealed pistol licenses qualify as valid background-check alternatives and that its previous, contrary determination was incorrect."  Appellee's Br. 14–15.  That makes this case more akin to *Doe v. University of Michigan*, in which the University's admission that a challenged policy violated federal law supported our conclusion that the case was moot as to that claim.  *See* 78 F.4th 929, 947 (6th Cir. 2023).

That a future administration could change course also does not alter our conclusion. Such "speculative contingencies" do not prevent mootness. *Hall v. Beals*, 396 U.S. 45, 49 (1969) (per curiam). The mootness inquiry does not require us to layer hypotheticals on top of possibilities on top of what-ifs. It is *always* the case that a future administration could move in a different direction. Not only is that always a risk, but it also overlooks the reality in this case that any new position would be unlikely to look just like the old position. Avoiding mootness today to resolve a later dispute that might not even manifest in the same way—indeed is unlikely to manifest in the same way given the many moving parts in these federal and state laws—does not honor our mandate to vigorously monitor the case-and-controversy imperative.

Our sister circuits have reached similar conclusions in the face of similar change-in-administration arguments. *See, e.g.*, *DeOtte v. Nevada*, 20 F.4th 1055, 1064 (5th Cir. 2021) (holding that the possibility that a "new Presidential Administration could change the rules . . . does not support that an injury is actual or imminent") (quotation omitted); *Brach v. Newsom*, 38 F.4th 6, 14 (9th Cir. 2022) (en banc) (the ability of the government to again close schools due to Covid-19 and "the fact the Governor has the power to issue executive orders cannot itself be enough to skirt mootness, because then no suit against the government would ever be moot") (quotation omitted); *Prison Legal News v. Fed. Bureau of Prisons*, 944 F.3d 868, 881 (10th Cir. 2019) ("[A]bsent evidence the voluntary cessation is a sham, the mere possibility a successor official may shift course does not necessarily keep a case live."); *Larsen v. U.S. Navy*, 525 F.3d 1, 4 (D.C. Cir. 2008) ("[T]he mere power to reenact a challenged policy is not a sufficient basis on which a court can conclude that a reasonable expectation of recurrence exists. Rather, there must be evidence indicating that the challenged policy likely will be reenacted.") (quotation omitted).

Roberts' observation that the ATF issued both advisories during a Trump presidency does not save the case. Because the ATF issued the 2020 advisory during the first Trump administration and revoked it in the second Trump administration, he insists, the Bureau will likely reverse course yet again. Why that is so is never explained, and seems unlikely anyway. In the first administration, keep in mind, concerns about compliance with the Second

Amendment did not undergird the review. That was not so the second time, and that explains in part, perhaps in full, why the administration now thinks its first advisory was mistaken.

Invoking the capable-of-repetition exception, Roberts insists that the ATF could again issue an advisory telling gun sellers to decline Michigan concealed-pistol licenses and then revoke it before a court decides the question. That asks too much of this exception. Conduct "evades review" only "if it is *impossible* to obtain complete judicial review." *In re Flint Water Cases*, 53 F.4th 176, 189 (6th Cir. 2022) (emphasis added) (quotation omitted). If the mere possibility that a defendant could again hypothetically restart and then "re-cease" a policy sufficed to prevent mootness, the exception would envelop the rule. Nothing necessarily prevents this type of case from reaching a judgment. Challenges to ATF background-check policies do not resemble, for example, elections, where the inherent time sensitivity makes running the full path of litigation impracticable before a particular controversy potentially exceeds a court's power. *See Thompson*, 7 F.4th at 525.

## C.

Because the case is moot, we must vacate the district court's order dismissing Roberts' complaint for lack of standing. Later events prevented Roberts from receiving full consideration of his arguments on standing—an issue on which we offer no opinion—requiring us to follow our customary practice of vacating the trial court's order. *See United States v. Munsingwear, Inc.*, 340 U.S. 36, 39 (1950).

We therefore vacate the district court's order dismissing Roberts' complaint for lack of standing and remand with instructions to dismiss the case as moot.